No. 9458.

OHIO & COLORADO SMELTING & REFINING COMPANY *v.*
PUBLIC UTILITIES COMMISSION, ET AL.

1. CONSTITUTIONAL LAW—*Obligation of Contracts.*   It is the overwhelming weight of judicial opinion that constitutional provisions against laws impairing the obligation of contracts do. not prevent the state from the proper exercise of the power vested in it for the promotion of the common weal and the general good.

Private contracts must yield to the public welfare where the latter is appropriately declared and defined.

2. PUBLIC UTILITIES COMMISSION—*Powers.* The Utilities Commission was held authorized to grant to a corporation furnishing electric power, an increase in the rate of charge fixed by a prior contract.

But the commission having by no competent testimony attempted to establish the value of the Utility Company's property, its order was set aside.

The power of the commission to determine that the rate of compensation fixed by a contract is insufficient, is a very grave and dangerous power, to be asserted with the greatest caution.

The capitalization of a concern has but little relation to its value, as affording a basis of rates.

3. ——*Rehearings.* A witness eminently qualified to speak as to the value of the plant of a utility company which has been authorized to increase its rates, was absent at the original hearing, but accessible when a motion for a rehearing came on. *Held* it was the clear duty of the Utilities Commission to reopen the case.

4. PUBLIC SERVICE CORPORATIONS—*Just Compensation for Service.* A Utility Corporation is entitled to a fair return upon the reasonable value of its property at the time it is being used for the public.

5. ——*Extensions and Improvements,* are not to be made, without the approval of the Utilities Commission. If such improvements are found unprofitable the company must be loser. It will not be permitted to charge the loss to the public.

6. SMELTING COMPANY—*Affected With a Public Interest.* A smelting company treating ores from various parts of the state, is affected with a public interest.

*Review to the Public Utilities Commission.*

MESSRS. YEAMAN & GOVE, for plaintiff in error.

Mr. WILLIAM V. HODGES, Mr. D. EDGAR WILSON, and Mr. ELSON H. WHITNEY, for the Colorado Power Company.

Mr. Justice Scott delivered the opinion of the court.

THE Salida Light, Power and Utility Company, a corporation organized under the laws of the State of Colorado, on

the 10th day of October, 1907, entered into a written contract with the Ohio and Colorado Smelting and Refining Company, a corporation, by which the Power company agreed to supply, and the Smelting company agreed to purchase from the Power company electrical energy sufficient to operate its smelter, located near Salida, Colorado. The price to be paid under the contract was $50.00 per horse power per annum, which it is agreed is equivalent to 7.65 mills per kilowatt hour. This contract was continued or extended by written agreement between the parties to October 10, 1923, the last extension bearing date of January 21, 1913. The contract involved extensive improvements by both parties which were afterwards made. Power has been continuously supplied to the Smelting company under the agreement until the present proceeding.

In February, 1915, the plant, properties, contracts, etc., of the Salida Light, Power and Utility Company were conveyed and assigned to the Colorado Power Company, which has since continued to operate the same. On April 13, 1918, The Colorado Power Company filed a petition with the Public Utilities Commission of the State, praying for an order increasing the rates above those provided in the contract, to one cent per kilowatt hour. To support this petition, it was alleged: "(a)   Increase in operating expenses; (b) The fair value of the Salida plant is $500,-000.00. A fair net return would be $40,000.00 per annum. The present net return is $32,224.00. The company is therefore entitled to an increase in its net return of $8,000.00. (d) The Smelting company requires approximately 60 per cent of the output of the Power company, and the inability of the Power company to derive a reasonable return is principally due to the rate named in the agreement for service to the Smelting company."

By motion to dismiss and by answer, the Smelting company contended in substance as follows: That the action demanded of the Public Utilities Commission was in violation of those certain provisions of the Federal and State constitutions, which guarantee due process of law, the

inviolability of contracts, and which deny the enactment of laws having retroactive effect; (b) denial of the allegation in the Power company's petition that $32,224.00, the alleged net revenue for the company for the year 1917, is not an adequate return upon the fair value of petitioner's property, and other specific denials, including the allegations of necessary increased use of steam power, necessary increase of operating expenses, averments as to average rates and distribution of current generated; denial that increase in revenue is necessary; and general denial of averments in petition not specifically denied. It was further alleged in substance: "The erection of an electric power plant by the Smelter company for its own use. Efforts of the Salida Light, Power and Utility Company to have Smelting Company abandon its own plant and take its power from the former company. The execution of the contract of October 10, 1907. The extension of that contract on January 9, 1913, at instance of Salida Light, Power and Utility Company. The transfer of all of the capital stock of the Salida Light, Power and Utility Company to the Colorado Power Company about Jan. 9, 1913. The transfer of all the assets of the Salida Light, Power and Utility Company to the Colorado Power Company Feb. 10, 1915. That the Smelting Company, as required by said contract, made certain changes, alterations and additions in its smelting plant and electrical system in compliance with provisions of the contract. At date of contract power was generated by petitioner almost wholly by water power. Its capacity was largely in excess of demands. The Smelting Company was the only concern of that character supplied by petitioner, and the Power Company plant was sufficient to supply all requirements of the district. That subsequent to Jan. 9, 1913, petitioner entered into other contracts with other consumers, which necessitated additional electric steam power equipment. The issuance by petitioner of $4,000,000.00 of first mortgage 5 per cent bonds, $750,000.00 of 7 per cent preferred stock and $11,000,000.00 of common stock. Payment by

petitioner of interest on its bonds, dividends upon its preferred and common stock, the setting aside for depreciation reserve of $99,000.00 in 1916, and $115,000.00 in 1917, and the accumulation of a surplus of $29,000.00 for 1916 and more than $91,000.00 for 1917. That the net earnings of petitioner for 1917 were more than 18 per cent in excess of net earnings for 1916, and the net income for 1917 was 25 per cent in excess of the net income for 1916. The total income of petitioner for 1917 exceeded $700,000.00 and the net income after all deductions exceeded $357,000.00. That petitioner on June 1, 1913, entered into a contract with the American Smelting and Refining Company and thereby agreed to furnish electrical current to that company for its smelter in Leadville upon practically the same terms specified in the contract of October 10, 1907, with the Ohio Smelting Company. That any order of the commission increasing the Smelting Company's rates would require it to pay a greater charge than the American Smelting and Refining Company and would be unjust, unreasonable, discriminatory and preferential. That the Smelting Company's plant was erected at a cost many times exceeding the cost of petitioner's Salida plant. The Smelting Company's plant has been operated at a loss, but has been largely beneficial to the city of Salida. An increase in the rate of the Smelting Company would result in additional loss to that company and increase the income of the Power Company."

The commission, upon hearing, ordered that the rate of 7.65 mills per kilowatt hour fixed in the contract be cancelled, and fixed the flat rate of 9.5 mills per kilowatt hour to be charged to the Smelting Company. We are asked to review that order.

Counsel for the Smelting Company has very elaborately and ably argued its contention that the decision of the commission was in violation of the several constitutional provisions suggested, and that the obligation of the contract between the parties was impaired, and that the plaintiff in error was deprived of its property without due pro-

cess of law; that the statute was retroactive, and that therefore the commission was without power to change or alter the terms of the contract.

We think without further discussion that it is the overwhelming weight of judicial opinion in this country, that the constitutional interdiction of statutes impairing the obligations of contracts does not prevent the State from properly exercising such powers as are vested in it for the promotion of the common weal, or as are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. We have heretofore decided this question as to contracts entered into by municipalities in relation to rates to be charged by public utilities, as affected by the after asserted power of the State. *Denver & South Platte Ry. Co. v. City of Englewood,* 62 Colo. 229. But a careful review of the authorities leads us to the conclusion that this rule as to the after asserted exercise of the police power applies equally in the case of contracts relating to a public service as between persons and corporations. The rule requires no further citation than that of the latest decided case of the United States Supreme Court, called to our attention, where the doctrine seems to be announced as the final word upon that subject by that Court. A further examination of the decisions of the appellate courts from the several states discloses the great weight of authority to be in agreement with the view of the Federal Supreme Court.

In the case of *Union Dry Goods Co. v. Georgia Public Service Corporation,* 248 U. S. 372, speaking through Mr. Justice Clarke, it was said: "The Georgia Public Service Corporation and The Union Dry Goods Company, both corporations organized under Georgia law and doing business in Macon, on July 18, 1912, contracted together in writing for the term of five years, the former to supply electric light and power to the latter, which agreed to pay stipulated rates for the service.

The contract was performed for almost two years, until in April, 1914, when the Dry Goods Company refused to

pay a bill for service rendered during March, in which a rate higher than that of the contract was charged. The Service Corporation claimed that this rate was authorized and required by an order of the Railroad Commission of Georgia, entered after investigation and hearing.

Soon thereafter the Dry Goods Company commenced this suit to compel specific performance of its contract, which had three years yet to run; to enjoin the Service Corporation from charging the higher rate, and from executing a threat to cut it off from a supply of electricity, because of failure to pay the increased rate.

The trial court and the Supreme Court of Georgia both held against the claims of the Dry Goods Company and the case is here for review on writ of error.   *   *   *

Of the several claims pressed in argument, we need notice only two: That the obligation of the contract of July 18, 1912, was impaired, and that the plaintiff in error was deprived of its property without due process of law, by the decision of the Supreme Court of Georgia, holding that the rates prescribed by the Railroad Commission were valid and superseded those of the contract between the parties. *   *   *

Except for the seriousness with which this claim has been asserted and is now pursued into this court, the law with respect to it would be regarded as so settled as not to merit further discussion.

That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus in *Manigault v. Springs*, 199 U. S. 473, 480, it was declared that:

'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from properly exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.'

This on authority of many cases which are cited.

In *Hudson County Water Co. v. McCarter,* 209 U. S. 349, 357, it is said that:

'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter.'

In *Louisville & Nashville R. R. Co. v. Mottley,* 219 U. S. 467, 482, this is quoted with approval from *Knox v. Lee,* 12 Wall. 457, 550, 551, viz:

. 'Contracts must be understood as made in reference to the possible exercise of the rightful authority of the Government, and no obligation of a contract can extend to defeat the legitimate government authority.'

In the same report, In *Chicago, Burlington & Quincy R. R. Co. v. McGuire,* 219 U. S. 549, at p. 567, it is said:

'There is no absolute freedom to do as one wills or to contract as one chooses. The guarantee of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.'

In *Atlantic Coast Line R. R. Co. v. Goldsboro,* 232 U. S. 548, 558, the court said:

'It is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.'

And in *Rail & River Coal Co. v. Ohio Industrial Commission,* 236 U. S. 338, 349, the state of the law upon the subject is thus aptly described:

'This court has so often affirmed the right of the State

in the exercise of its police power to place reasonable restraints like that here involved, upon the freedom of contract that we need only refer to some of the cases in passing.'

These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the State, and the judgment of the Supreme Court of Georgia must be affirmed."

It is urged that when the contract in this case was made and at the time of the extensions, the Public Utilities statute was not in effect and that both companies were private corporations with full power to make the contract they did, and for such reason the rule cannot apply. This contention cannot be sustained. In the case cited, quoting from the case of *Louisville & Nashville R. R. Co. v. Mottley,* 219 U. S. 467, it was said: "Contracts must be understood as made in reference to the possible exercise of the rightful authority of the Government, and no obligation of a contract can extend to defeat the legitimate government authority." So we must hold in this case that the power of the commission to act in the premises must be sustained.

Conceding then, the jurisdiction of the Public Utilities Commission, it remains to determine the question of the validity and justice of the order entered. The record discloses that the Colorado Power Company is a public utility corporation, seemingly operating in Colorado alone, and that it generates its electrical energy by means of water and steam power. It is a large concern, and its operations cover a large part of the State, particularly the western and southern portions. Its capital stock consists of $750,000 preferred, to the extent of a seven per cent. annual dividend, and $11,000,000 common stock. It has a bonded indebtedness of $4,000,000, bearing interest at five per cent. per annum. The record discloses that the corporation has for some years paid the dividend on its preferred stock, and has met the interest on its bonds, and for the two

years prior to the hearing, paid a dividend on its large issue of common stock, of two per cent. In addition to this, it set aside $99,000 in 1916, and $115,000 in 1917, for depreciation, and showed the accumulation of a surplus of $29,000 in 1916, and $91,000 in 1917, the latter being the year preceding the hearing. This computation includes the operation of that part of the property of the company referred to in this case as the Salida plant.

It is very clear that the Colorado Power Company, complainant, operates all its properties as one concern; that its receipts and disbursements are from the one treasury. But the commission, for some unexplained reason considered the Salida plant alone in the establishment of the rate.

In discussing the findings and conclusions of the commission, we will treat of these separately. The unquestioned rule of law is that what the utility company is entitled to demand in the matter of rates, in order that it may have just compensation, is a fair return upon the reasonable value of its property at the time it is being used for the public. Pond on Public Utilities, Sec. 476. To ascertain such reasonable value for the purpose of fixing rates and in addition to its net earnings, it is the rule of law that there are four different theories for the determination of what constitutes a reasonable value under the facts of any particular case. "These theories are generally defined by terms which indicate the method of ascertaining what would be a fair return on the reasonable value of the property, and are thus expressed—original cost; cost of reproduction; outstanding capitalization, and present value. Since the authorities are not agreed as to the proper theory for determining rates nor as to the manner of applying the legal principle established for that purpose, it is impossible that they should agree on what constitutes a reasonable rate in any case or that a decision in any state should control in other states, although the facts of the case may be similar or even identical because the courts are not agreed as to the proper theory to be applied for the solution

of the question." Pond, Public Utilities, Sec. 477. The adoption of any one of these four theories in a given case is attended with great difficulty and in some cases impossible for any one of them to prevail and justice be done. But so many decisions have been rendered in relation to the proper method of ascertainment of the reasonable value of the property, that commissions of this ·character may be presumed to be fairly enlightened when considering the particular case as to whether any one or more of these theories may be justly adopted and for such reason, so that in this case a further discussion of this subject is not important.

But it is a necessary prerequisite that a reasonable value of the property at the time it is being used be established. It is then necessary in all cases that this value be considered as a basis for the fixing of rates. These rules were both violated by the commission·in the case under consideration. For by no competent testimony did the commission attempt to establish a reasonable value of the property of the Power Company, either as a whole or of the Salida plant as a part thereof. The commission cannot be lawfully excused for this failure upon its part. It is not a court to consider and determine only that which is brought before it. It is a legislative agent, with certain administrative duties. One of its duties is to investigate and determine in the interest of the State. For this purpose the State has provided it with the proper engineers and other expert assistants to ascertain whatever facts may be necessary or important to justify a conclusion in any case, and this independent of, or in addition to, any testimony produced by the parties directly interested. Indeed, the statute expressly provides that the commission may investigate and determine as to any rate, rule or regulation, upon its own initiative.

The sole reason for holding that the power rests with the commission to increase or decrease a rate stipulated in a contract, and that the exercise of such a power is not an infringement of the constitutional inhibitions against the

impairment of a contract obligation, and likewise the guarantee of due process of law, is that the public welfare demands it in the specific case. Therefore the commission, with the delegated legislative power of the State, must determine that the rate fixed in the contract is detrimental to the public weal. This is the exercise of a very grave and dangerous power and should be asserted with the greatest caution, and by means of every instrumentality at the command of the commission, to determine with reasonable certainty that the rate fixed in the contract injuriously affects the public welfare. It is not as if the commission were to establish a rate in the first instance, as based upon its own judgment as to reasonableness, but it must first determine that a contract in this respect, between persons engaged in the particular business and presumably well advised as to its probable effect, not only at the time, but in the light of future conditions, is so unreasonable as to be detrimental to the public interest.

As to the entire business of the Power Company, the evidence, if what was before the commission may be dignified by that term, is as above stated. It would seem that the dividends paid, the interest on the bonds, the amounts set aside for depreciation and surplus, aggregating $357,000, may be presumed in the natural order of things to be reasonable, when we consider its acceptance for so many years. This, at an interest rate of seven per cent. annually, the preferred stock rate, and therefore the agreed rate in that case, would sustain a valuation of $5,100,000. There is no testimony in this case from which the commission could conclude that the present value of the plant equalled any such sum, and it did not attempt to so determine.

The issue by that company of the enormous amount of eleven millions of dollars par value of common stock, and upon which it is paying a two per cent. annual dividend, was sufficient to put the commission upon inquiry as to whether this represeted the actual value, or whether it was in fact what is commonly termed "watered stock." This

fact and other circumstances in the case made it plain that it was the duty of the commission to ascertain the reasonable present value of the plant, and also to investigate the arbitrary amounts set aside for depreciation and surplus.

That the outstanding capitalization can have but little, if any, relation to the value, as affecting the basis for rates, is the accepted rule of the courts.   Mr. Pond states the rule to be: "The theory of outstanding capitalization is not satisfactory because experience has shown that in many cases it has very little, if any, relation to the actual value of the investment.  Fortunately for the consumer, the courts are practically agreed that the outstanding capitalization or the amount of stock and bonds issued is neither a fair test of the capital actually invested in the business nor a reliable measure by which to estimate the reasonable value of the property used and useful in rendering the service; and many cases have expressly stated that there is little, if any, logical connection between the actual value of the investment and the par or even market value of the stock and bonds issued by the company, which the courts have said only constitutes evidence of the history of the development of the business and are valuable chiefly for that purpose." Pond, Public Utilities, sec. 480.  The failure to observe this rule in the ascertainment of the value of the Salida plant, upon which the commission elected to base its order, is as flagrant if not more so, than in the case of the entire property of the Power Company.

The commission very properly declined to fix the reasonable value of the Salida plant for rate making, as being that of $500,000, which was testified to by the witness for the Power Company, as the book value, and represented the purchase price.  Neither did it fix any other specific value.  The commission said: "Any adjustment in the rate now being paid by the Smelting Company must therefore be made on a finding that such rate is preferential and discriminatory as regards other consumers."  It will thus be seen that the commission wholly abandoned the allegations of the complaint to the effect that the Power Com-

pany's rate to the Smelter Company should be increased because of increased cost of operation, and insufficient return on its invested capital in its Salida plant, and determined the matter solely upon a theory that is not involved in the pleadings, viz., that the contract rate with the Smelter Company "is preferential and discriminatory as regards other consumers." This question was not only not involved in the pleadings, but wholly without sufficient proof to sustain a finding that there was discrimination in favor of the Salida smelter alone. It is palpable that if there is such discrimination as affects the public welfare, it applies equally at least in the case of the Leadville smelter, which the commission used only in comparison. And here is where the commission unnecessarily got into deep water, by abandoning the universal rule of the courts to the effect that the basis must be the reasonable value of the property at the time.

It was clearly within its own power by the use of its skilled assistants, to reasonably ascertain this value. Not only this, but it also appears from the record that there was a witness, a Mr. Disman, who as president and principal owner of the Salida plant, constructed the same, and could testify as to the original cost of the plant, but who was absent from the State at the time of the hearing. But this witness was present and accessible at the time of the consideration of the motion for a rehearing, one of the grounds of which was the offer to present this competent witness, and that he could testify that the actual value of the plant did not exceed $200,000. It was the clear duty of the commission under the circumstances to reopen the case and ascertain, if possible, the reasonable value of the plant. The commission is not confined to technical rules of procedure, and as an investigator, its duty was to ascertain the facts so important and basic in reaching its conclusion.

If it was a fact that the value of the plant did not exceed $200,000, and if the question was to be determined on the Salida plant alone, then the admitted net annual return of

$34,000, which the evidence shows, furnished a net profit of seventeen per cent upon the investment, which the commission had no right to increase, but on the contrary should have reduced, if it assumed to annul the contract between the parties as to the rates to be charged for the service. The commission found: "In the year 1916, the combined steam and water power plants of the Salida property generated 5,794,780 kw.-hr. and sold to the Smelting Company alone 3,403,037 kw.-hr. In the year 1917 these combined plants generated 6,069,620 kw.-hr., and sold to the Smelting Company 3,369,900 kw.-hr. It appears, therefore, that the sales to the Smelting Company comprise approximately 60 per cent of the total amount of current generated by the Salida plants, and somewhat more than 60 per cent of the current sold or accounted for.

For the year 1917 the cost of steam power plant generation in the Salida plant showed an increase of $9,362.00 over the year 1916. Apportioning this increase to the Smelting Company on the basis of "use", 60 per cent of such increase in the cost of steam power generation, or $5,617.00, should be assigned to the Smelting Company. This is the equivalent to an increase of 1.67 mills per kw.-hr., which if added to the present rate of 7.65 mills per kw.-hr., would result in a rate of 9.32 mills per kw.-hr., which appears to be justified on account of the increase in the cost of steam power generation."

It appears that the Power Company was at the time supplying power for the plant of the American Smelting and Refining Company, located at Leadville, under a similar contract entered into about the time of the last extension of the contract with the Ohio company, and covering about the same period, but the rate to be charged under that contract was fixed at 7.5 mills, or .15 mills lower than that fixed in the Ohio company contract. The commission held, in effect, that there was discrimination under these contracts in favor of the Salida smelter, notwithstanding the higher rate paid, and also that there was no discrimination between the rate it fixed for the Salida smelter of 9.5

mills per kw.-hr., and the rate under the contract with the Leadville smelter of 7.5 mills per kw.-hr. Just how or why this excess in rates of 2 mills, or more than 26 per cent of the entire charge to the Leadville smelter should be added to the rate of the Salida smelter without discrimination in favor of the Leadville smelter does not satisfactorily appear, either from the findings of the commission or the testimony in the case.

The commission adopted the arbitrary classification of the Power Company, and then concluded that the consumption of power by the Leadville smelter is double that of the Salida smelter, that the load factors are the same, and that for such reasons the Leadville smelter would earn a lower specific rate per kw.-hr. If we concede the principle, yet it does not appear that the difference can be so great as 26 per cent., particularly when the Power Company itself in its contracts with the two concerns, made at about the same time, recognized a difference in all particulars of only .15 mill and not 2 mills as found by the commission. Every sense of justice demands that the Power Company be held to its contract in this respect, rather than the commission should, through mere speculation and conjecture (and that is the only basis for the finding) add 1200 per cent to the agreed and accepted difference in cost in supplying power to the two concerns.

The holding of the commission on its face in this particular appears to constitute discrimination against the Salida smelter, and in favor of the Leadville smelter. The commission found that: "Since the above mentioned contract was entered into the demands of the community for the service of the Power Company have continued to grow, and as a result further additions have been made to both the hydro-electric and steam plants. The present capacity of the hydro-electric plant is 1200 kilowatts, and of the steam plant in Salida 700 kilowatts, making the total installed capacity of the Salida property 1900 kilowatts."

The testimony is clear that when the contract was made with the Salida smelter, the grantor of the Power Company

was supplying only the city of Salida, and that it had a surplus of power equal to and in excess of the power required by the Salida smelter. That the contract was solicited by the Salida Light, Power and Utility Company in order to find a market for the unused capacity. That the Light and Power Company generated its electrical energy solely by water power, except that it had one steam plant for use in case of emergency; that the smelter was at the time furnishing its own power by means of its own plant, and that in order to use power furnished by the Power Company, it became necessary for the Smelter Company to abandon its steam plant, and to install electrical appliances at great cost. It is clear also that aside from power furnished the D. & R. G. R. R. Co. at Salida, a comparatively small amount, the Power Company installed steam plants and extended lines and incurred other expense in order to supply mining and other industrial companies at great distances from its plant, which proved to be unprofitable. It is also clear that in so doing it incurred the greater part of the expense of its added improvements and increased operation, subsequent to the acquisition of the Salida plant. Such improvements are estimated at $113,000.00, or more than one-half of the value of the present plant, as that value was proposed to be established by the Smelter Company. It appears also that that Power Company made these improvements and extensions without having obtained the approval of the Utility Commission, or obtaining a certificate of necessity, in direct violation of the statute. It is the very purpose of the statute in this particular to prevent the burden to the public which may arise by reason of speculative or unnecessary extensions and improvements, by means of an investigation by the commission, and the granting of a certificate of necessity.

The Power Company had no lawful authority to make such extensions and improvements and did so in plain violation of the law. If, therefore, it made an unprofitable investment it must bear the burden, and will not be per-

mitted to charge it to the public. It appears that the claim for increased cost in operation of the Salida power plant is based chiefly on the cost arising by reason of such extensions and improvements, and the added cost of steam power used in the operation of the same.

It is not the purpose of the Public Utilities law to make the State the insurer of unlawful, unwise or unnecessary investments by public utilities corporations, and in the absence of the required certificate of necessity, and certainly in the absence of clear proof to the contrary, we must presume that such extensions were at least unnecessary.

The equities of the case are not with the Power Company. The Smelting Company is as much affected in fact with a public interest as is the Power Company. It performs a public service in the treatment of ores from mines from various parts of the State. Without smelters and mills to perform this service for the public, the mining industry of the State must of necessity seriously suffer. Besides, the Smelter Company, in this case, is of vast public interest to the community in which it is located. It furnishes a payroll of about $300,000 per annum, to which that of the Power Company in the locality is comparatively insignificant.

The testimony discloses that there has been about $1,000,000 invested in the plant of the Smelter Company, including replacements. Its losses for the year 1908 were $322,198.97. The plant lost an average of $70,000 for eleven years. In 1917 there was a profit of $185,795.52. In 1916 the profit was $82,072.32, allowing nothing for salaries or depreciation. It was unable at the time of the hearing to operate at a profit and was continuing only in the hope that it might make a profit some time in the future.

To pay the rate fixed by the commission will either compel it to cease operations or increase the price of treatment to its customers. It is a competitor of the Leadville smelter. Such is the testimony in these particulars.

It cannot be said that to sustain one public utility at the expense of another is in the interest of the public welfare, and if we are to rely upon the showing here, this must be the result, if the order of the commission is to be sustained. Yet the interest of the public weal is the only theory upon which the commission can exercise the power to abrogate the contract between the parties. I may repeat that this power is so grave, with such possibilities of being erroneously exercised, through want of proper understanding of the facts and of the principle upon which it is based, that it should be denied or greatly curtailed by an amendment to the statute.

The commission in this case made no investigation of its own, and determined the matter wholly upon the testimony of the contending parties. In such a case the burden is upon the petitioner clearly, which it has not sustained. The sufficiency of the rate prescribed to produce a fair profit upon the value of the property employed in the business is to be strongly presumed. The burden of showing its confiscatory character rests, therefore, upon the complaining company. *Lincoln Gas Co. v. Lincoln,* 223 U. S. 349. The presumption must be correspondingly stronger where the rate rests upon a contract between the parties, understandingly entered into.

The order of the commission is reversed with instructions to dismiss the proceedings.

*Reversed with instructions.*

*En banc.*

Teller, J. agrees with conclusion only.