**US WEST COMMUNICATIONS, INC. Petitioner–Appellee,**

v.

**COLORADO PUBLIC UTILITIES COMMISSION, Commissioners Robert J. Hix and Vincent Majkowski, Respondents–Appellants.**

No. 97SA438.

Supreme Court of Colorado, En Banc.

April 26, 1999.

Denman & Corbetta, P.C., Steven H. Denman, Richard L. Corbetta, Melissa A. O'Leary, Denver, Colorado, US West Communications, Inc., Kathryn E. Ford, Denver, Colorado, Attorneys for Petitioner–Appellee.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Linda L. Siderius, Deputy Attorney General, Raymond L. Gifford, First Assistant Attorney General, Eugene C. Cavaliere, Senior Assistant Attorney General, Regulatory Law Section, Denver, Colorado, Attorneys for Respondents–Appellants Colorado Public Utilities Commission, Commissioner Robert J. Hix and Commissioner Vincent Majkowski.

Justice KOURLIS delivered the Opinion of the Court.

In this case, the Colorado Public Utilities Commission (PUC or Commission) appeals an order of the Denver District Court setting aside two PUC rules concerning nondiscriminatory access to "premium listings"[1] and "guide pages"[2] in white pages telephone directories. The PUC issued these rules pursuant to Colorado's 1995 telecommunications deregulation act, which opened the local telephone market in Colorado to competition after over eight decades of operation as a regulated monopoly. *See* ch. 182, sec. 1, §§ 40–15–501 to –511, 1995 Colo. Sess. Laws. at 746–58 (codified at sections 40–15–501 to –511, 11 C.R.S. (1998)) (House Bill 1335 or Act). The rules, 4 C.C.R. 723–39–5.12.5 and 5.12.6 (1996), require Appellee U.S. West Communications, Inc. (USWC), an existing provider of local telecommunications services in Colorado or "Incumbent Local Exchange Carrier" (ILEC), to offer competitors in the local markets or "Competitive Local Exchange Carriers" (CLECs), non-discriminatory access to premium listings and guide pages in white pages directories.

USWC does not directly publish white pages directories for its customers, but rather subcontracts this task to an affiliated company, U.S. West Direct, Inc. ("Direct").[3] Consequently, at trial, USWC argued that the PUC did not have jurisdiction to issue regulations requiring nondiscriminatory access to the Direct publication, because the publication of telephone directories is an unregulated activity. Furthermore, USWC contended that the PUC's imposition of telephone directory requirements on USWC would force USWC to modify its pre-existing directory publication contract with Direct, thus constituting tortious interference with contract.[4]

The district court agreed with USWC's latter argument, ruling that "to the extent that [Rules 5.12.5 and .6] may require [USWC] to modify its contract with [Direct] regarding publication of its White Pages directory, the Court finds that [the rules] violate several principles of Colorado common law." *US West Communications, Inc. v. Public Utils. Comm'n,* No. 96CV2566 (Denver Dist. Ct. Oct. 24, 1997). Specifically, the district court found that implementation of the rules by the PUC would violate Colorado's prohibitions against unilateral modification of contract and tortious interference with contract, as well as the common law requirement that a third party may not become a party to a contract without the consent of the original parties. Because we view USWC as the regulated entity, and because the regulations at issue represent a reasonable effort to remove barriers to entry in the local exchange telecommunications markets, we uphold the rules at issue.

I.

In its Legislative Declaration to House Bill 1335, the General Assembly set forth the purpose of the Act:

1. Premium listings are listings in non-standard typeface in the text of white pages directories.

2. Guide pages are information pages that provide customer service and contact information for the local exchange carriers (LECs) in white pages directories.

3. USWC and Direct are both subsidiaries of U.S. West, Inc.

4. During the PUC's rulemaking proceedings, the Federal Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), became law,

implementing objectives similar to those in House Bill 1335 on a nationwide basis. USWC did not argue before this court or the district court that the Federal Telecommunications Act of 1996 preempted the PUC's authority to promulgate Rules 5.12.5 and .6. Because we hold that House Bill 1335 supports the PUC's issuance of these rules, we do not consider whether the Telecommunications Act of 1996 provides an independent justification for the rules.

The general assembly hereby finds, determines, and declares that competition in the market for basic local exchange service will increase the choices available to customers and reduce the costs of such service. Accordingly, it is the policy of the state of Colorado to encourage competition in this market and strive to ensure that all consumers benefit from such increased competition.

§ 40–15–501(1), 11 C.R.S. (1998). To further such competition, the General Assembly declared that "[i]t is the policy of this state that all barriers to entry into the provision of telecommunications services in Colorado be removed as soon as practicable." § 40–15–502(7), 11 C.R.S. (1998). Rather than proscribe specific barriers to entry, however, the General Assembly vested broad rulemaking authority in the PUC: "Local exchange telecommunications markets shall be open to competition, under conditions determined by the commission by rule." § 40–15–502(1), 11 C.R.S. (1998). The General Assembly directed the PUC to design its rules in a manner that would "foster and encourage the emergence of a competitive telecommunications marketplace." § 40–15–503(2)(a), 11 C.R.S. (1998).

In accordance with this mandate, the PUC initiated seven rulemaking proceedings in November 1995. During these proceedings, the Commission concluded that the "provision of a single White Pages directory to telephone customers is in the public interest" and that the "imposition of a directory publication requirement upon new entrants would constitute an unreasonable barrier to entry." [5]

Thus, the Commission promulgated Rules 5.12.1 to .6, setting forth various requirements for the publication of a single white pages directory by the existing telephone service provider in each local area.[6] Rule 5.12.1 sets forth the basic requirement that each incumbent telephone service provider,

or ILEC, "shall cause the customer information (i.e. name, address, and telephone number) of all customers within the local calling area served by the [ILEC] regardless of whether the customer subscribes to the telecommunications services of that particular provider, to be published in a 'White Pages' telephone directory." 4 C.C.R. 723–39–5.12.1 (1996). USWC does not challenge this requirement.

Rather, at issue in this case are the more specific requirements in Rules 5.12.5 and 5.12.6. Rule 5.12.5 states: "Each 'White Pages' provider shall offer premium listings in its 'White Pages' telephone directory to competing telecommunications providers' subscribers." Rule 5.12.6 states:

Each "White Pages" provider shall provide competing telecommunications providers space in the customer guide pages of the "White Pages" telephone directory for the purpose of notifying customers how to reach competing providers to: (1) request service; (2) contact repair service; (3) dial directory assistance; (4) reach an account representative; (5) request buried cable local service; (6) contact the special needs center for customers with disabilities.

As an ILEC, USWC falls within the definition of a "White Pages provider" for the purpose of these rules. See 4 C.C.R. 723–39–2.10 and –5.12.1 (1996).

The PUC argues that Rules 5.12.5 and .6 are necessary to achieve the goal of providing customers with a single white pages directory, while ensuring that CLECs are not competitively handicapped by an inability to offer to their customers the same white pages directory services as the ILECs.

■ Before turning to the propriety of these rules, we note that, contrary to the arguments of USWC, the rules do not impose the economic burden of offering premium listings and guide pages on USWC.[7] Rather, the rules ensure fair compensation for these

5. PUC Docket No. 95R–556T, Decision No. C96–347 at 41 (Mar. 29, 1996) (Hereinafter "Commission Decision").

6. Specifically, the rule refers to "[e]ach telephone service provider certified before February 8, 1996." Rule 5.12.1.

7. USWC argues that the "Commission's rules force [USWC] into the onerous position of working for the CLEC as an unpaid agent without any express compensation for acting as that agent."

services by allowing USWC to collect nondiscriminatory and competitively neutral tariffs, based on the costs of providing the services plus a reasonable profit.[8]

## II.

In our analysis of Rules 5.12.5 and .6, we first address whether these rules conform to the general rulemaking requirements of the State Administrative Procedure Act (State APA). In relevant part, the State APA requires this court to set aside final agency rules if we find that "the agency action is arbitrary or capricious, . . . in excess of statutory jurisdiction, authority, purposes, or limitations, . . . based upon findings of fact that are clearly erroneous on the whole record, [or] unsupported by substantial evidence when the record is considered as a whole. . . ." § 24–4–106(7), 7 C.R.S. (1998). We presume rules adopted in accordance with statutory rulemaking proceedings to be valid. *See Regular Route Common Carrier Conference v. Public Utils. Comm'n,* 761 P.2d 737 (Colo.1988). Thus, a party challenging such a rule carries the burden of showing that the rule is invalid. *See Augustin v. Barnes,* 626 P.2d 625 (Colo.1981); *Amax, Inc. v. Water Quality Control Comm'n,* 790 P.2d 879 (Colo.App.1989). Here, USWC has failed to show: (1) that the PUC lacked authority to promulgate the two rules; or (2) that the PUC's rules were inadequately supported by the record.

## A.

First, we conclude that the promulgation of Rules 5.12.5 and .6 fell within the PUC's statutory jurisdiction. House Bill 1335 specifically directed the PUC to promulgate rules governing the local exchange telecommunications markets with the objective of removing "all barriers to entry" into those markets. *See* §§ 40–15–502(1),(7) and – 503(2)(a), 11 C.R.S. (1998). Thus, to the extent that the denial of equal access to premium listings or guide pages constitutes a barrier to entry, the PUC had the authority to promulgate regulations addressing the issue.

In this regard, we note that some deference to administrative expertise is appropriate where regulations are based on "'judgmental or predictive facts,' which are primarily founded on policy choices rather than factual determinations and which are not capable of definitive proof." *Citizens for Free Enter. v. Dept. of Revenue,* 649 P.2d 1054, 1064–65 (Colo.1982) (quoting *Federal Communications Comm'n v. National Citizens Comm.,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) (upholding regulations of the Federal Communications Commission (FCC) requiring mass media divestiture to support diversity in information viewpoints even though the record failed to conclusively support the FCC's prediction that ownership diversity would result in information diversity)). Hence, we defer to the PUC's administrative expertise in its predictive finding that access to guide pages and premium listings would eliminate a barrier to entry into the market by CLECs.

In fact, USWC appears to concede the existence of sufficient factual support for the PUC's determination that regulation of the premium listings and guide pages was necessary to eliminate a barrier to entry. USWC's principal argument is rather that the *manner* in which the PUC chose to implement its regulations was improper.

In our evaluation of such policy contentions, we are "mindful that our task is not to substitute our judgment for that of the administrative agency; rather, it is to assure that the regulation is the product of reasoned

---

8. *See* 4 C.C.R. 723–39–7.5.1, 5.2 (1996). In its decision adopting the new rules, the PUC expressly stated that the new rules "would permit the incumbent LECs to charge other providers for the publication of the White Pages directory." Commission Decision at 41. Correspondingly, Rule 7.4 unambiguously states that proposed tariffs shall "establish the rates, terms, and conditions for the transfer of customer information, the publication of 'White Pages' telephone directories for the competing provider, the *publication of customer guide information for the competing provider, and the publication of premium directory listings* for the competing provider's customers." 4 C.C.R. 723–39–7.4.1 (1996) (emphasis added). Tariffs must be submitted to and approved by the PUC, which may "consider, where applicable, the compensation arrangement that the 'White Pages' provider has with its publisher." 4 C.C.R. 723–39–7.4.2 (1996).

decision-making fairly defensible in light of the material before the agency and its latitude in the resolution of policy matters." *Citizens For Free Enter.*, 649 P.2d at 1065.

### B.

■ We thus turn to the second consideration regarding the rules' validity: whether the record adequately supports the rules. Here, USWC has failed to show that the PUC's findings concerning the need for Rules 5.12.5 and .6 were arbitrary or capricious, clearly erroneous based on the entire record, or unsupported by substantial evidence in the record. This court has ruled that for purposes of informal rulemaking by administrative agencies, the "arbitrary and capricious" and "substantial evidence" standards of section 24–4–106(7) tend to merge. *See Citizens for Free Enter.*, 649 P.2d at 1062 n. 6. "[T]he underlying question is whether the agency action is reasonable," that is, "whether the factual component of administrative rulemaking [is] supported by the administrative record." *Id.* Furthermore,

> [w]here the reasonableness of a regulation is based upon the exercise of policy judgments and not controverted questions of critical fact, the agency is not bound by contrary submissions reflecting a different policy preference, and the fact that the agency exercised its discretion in a manner contrary to that advocated by the objectors did not mean that the agency action was not "based on the record."

*Id.* at 1063.

Here, the PUC held two days of hearings concerning various proposed interconnection and unbundling rules, during which Rules 5.12.5 and .6 were the subject of some controversy. The PUC heard arguments from USWC and other parties in interest concerning various positions on the two proposed rules. In this regard, Rules 5.12.5 and .6 appear to represent a reasonable compromise based on the divergent positions of the various parties.[9]

We find that the PUC's Rules 5.12.5 and .6 are reasonable in light of the Commission's mandate to promote competition and eliminate barriers to entry in the local exchange markets. Thus, we find that USWC has failed to show that the PUC acted contrary to section 24–4–106(7) when it promulgated Rules 5.12.5 and .6.

### III.

Having determined that the PUC properly promulgated Rules 5.12.5 and .6 in accordance with House Bill 1335 and the State APA, we turn to the question of whether these rules constituted tortious interference with contract.

The district court ruled, and USWC now contends, that the sanctity of the publishing contract between Direct and USWC protects USWC from regulatory impact by the PUC. USWC does not reveal, however, even in general terms, the manner in which the burden of the two rules impacts its existing contract with Direct, nor does it explain why USWC could not enter into another contract with Direct to ensure that Direct provides the services required of USWC by Rules 5.12.5 and .6.[10]

USWC argues that because it does not publish the white pages directories, the PUC may not impose on it the requirement of negotiating guide pages and premium listing contracts on behalf of the new CLECs. However, the rules do not impose a duty to negotiate upon USWC. They simply impose

---

9. For instance, according to the Commission Decision adopting Rule 5.12, the CLECs had contended that "publication of a comprehensive White Pages directory ... has intrinsic value. That value would inure to the incumbent LECs as publishers of the directory and should be considered as in-kind compensation for any costs associated with publication of the directory." Commission Decision at 40. Despite this argument, the PUC decided to allow the ILECs to charge CLECs for directory services such as those at issue in this case.

10. Such a contract, which might well require Direct rather than USWC to negotiate with the CLECs, would simply ensure, as does USWC's current contract, that USWC complies with the rules applicable to it as an ILEC. The rules enable USWC to charge CLECs a reasonable tariff for guide pages and premium listings, *see* 4 C.C.R. 723–39–7.5, thus enabling USWC to recover its contract costs.

the obligation to "*offer* premium listings" and "*provide* ... space in the customer guide pages." Rules 5.12.5 and .6 (emphasis added).

■ We find USWC's arguments unpersuasive. Regardless of the exact nature of USWC's contract with Direct,[11] a regulated monopoly may not evade regulatory requirements simply by contracting a service with a non-regulated third-party and then claiming that future rules concerning the service are invalid if they interfere with the contract. *See Ohio & Colo. Smelting & Ref. Co. v. Public Utils. Comm'n,* 68 Colo. 137, 143, 187 P. 1082, 1085 (1920) (quoting *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908), for the proposition that "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them"). In fact, the state's authority to promulgate laws and regulations that impact contracts extends even to contracts made by non-regulated entities: "Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority." *Ohio & Colo. Smelting & Ref. Co.,* 68 Colo. at 144, 187 P. at 1085 (quoting *Louisville & N. R.R. Co. v. Mottley,* 219 U.S. 467, 482, 31 S.Ct. 265, 55 L.Ed. 297 (1911)); *see also Zelinger v. Public Serv. Co.,* 164 Colo. 424, 432, 435 P.2d 412, 416 (1967) (holding that the PUC may regulate or modify power rates fixed by contracts, even if the contracts were executed prior to the passage of the statute conferring PUC ratemaking authority).

Rules 5.12.5 and .6 represent a reasonable and proper exercise of the PUC's rulemaking authority. USWC is subject to that rulemaking authority. Hence, the effect of these two regulations on the contract between USWC and Direct did not constitute an unreasonable or tortious interference with that contract.

### IV.

In conclusion, we hold that the district court erred in striking down Rules 5.12.5 and .6., and accordingly we reverse the district court's judgment as to these rules.

---

11. In early 1984, U.S. West, Inc., transferred its directory publishing assets from its telephone company, then Mountain States Telephone and Telegraph Company (Mountain Bell), to an independent operating company, U.S. West Direct, Inc. *See Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n,* 763 P.2d 1020, 1023–24 (Colo. 1988). Finding that this transfer was contrary to the public interest and an abuse of management discretion, the PUC ordered Mountain Bell to reacquire the publishing assets. *See id.* at 1024. This court affirmed the propriety of that order. *See id.* at 1033.

Subsequently, in March 1989, the PUC, Mountain Bell, and Direct entered into a settlement agreement pursuant to which the PUC rescinded its earlier order, but required U.S. West, Inc., to make annual equity infusions to USWC commen-

surate with the revenue value of the directory publication enterprise to USWC ratepayers had USWC retained that enterprise within its corporate structure. The settlement agreement was effective for three years and was renewable annually thereafter. Under the same timeline provisions, the agreement implemented a "Plan" that provided:

> US West Direct will fulfill USWC's obligation to publish and distribute directories under Rule 22 of the Commission's Rules Regulating the Service of Telephone Utilities (Rule 22), and the Commission shall not restrict or affect U.S. West Direct's right to publish advertising. US West Direct shall execute a contract with USWC to publish the directories required under Rule 22.