No. 21226.

CONSOLIDATED FREIGHTWAYS CORPORATIONS OF
DELAWARE, ET AL. *v.* THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF COLORADO.
(406 P.2d 83)

Decided October 4, 1965.

JONES, MEIKLEJOHN, KILROY, KEHL & LYONS, for plaintiffs in error Consolidated Freightways Corporation of Delaware; Orville Dunlap and Harold Ross Dunlap, dba Orville Dunlap & Son; and Eveready Freight Service, Inc.

ERNEST PORTER, T. A. WHITE, for The Denver & Rio Grande Western Railroad Company.

WILLARD L. PECK, J. C. STREET, for The Colorado & Southern Railway Company and Chicago, Burlington & Quincy Railroad Company.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, ROBERT P. FULLERTON, Assistant, ROBERT N. TRUNK, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THIS writ of error challenges the lawfulness of the decision and order of the Public Utilities Commission of the State of Colorado, hereinafter referred to as the Commission. Plaintiffs in error will be referred to as such or by name.

Pursuant to statutory procedure, the order of the Commission was reviewed on certiorari by the Denver District Court, and judgment was entered upholding the decision and order of the Commission. We are asked to reverse the judgment of the trial court and to declare the decision of the Commission null and void on a variety of grounds, which may be summed up as follows:

(a) That the Commission exceeded its jurisdiction.

(b) That its order is contrary to the statute governing the law and procedures relating to the regulations of the Public Utilities and the duty imposed upon the Commission in connection therewith.

(c) That the action of the Commission was in violation of the concept of due process as guaranteed in the constitution of Colorado and as prescribed in the statutes relating to the Public Utilities Commission and its prescribed duties.

(d) That the Commission has abrogated its functions and is refusing to carry out its duties in connection with the regulation of the transportation of petroleum and petroleum products in bulk, in tank trucks, and/or trailers in Colorado.

It appears from the record that the decision complained of was entered in case No. 1585. Certified as part of the record on certiorari are prior decisions in this same case, indicating that it has been continuously before the Commission and subject to alteration and amendments over a period of time dating back to April 4, 1944, when the first order was entered therein. The sum total of all of the decisions and orders prior to the one here under attack indicates that continuously for the last nineteen years the Public Utilities Commission has prescribed exact rates for common carriers and

minimum rates for private carriers of bulk petroleum and petroleum products in the State of Colorado. These rates, as prescribed, were the only rates that could be published in their tariffs and charged by the common carrier and set a floor below which no private carrier could charge. The order in effect at the time of the Commission's act being reviewed herein was entered April 9, 1957, effective September 1, 1957. After that date and until now all carriers involved in the transportation of petroleum and petroleum products were ordered to cease and desist from demanding, charging and collecting rates and charges which shall be greater or less than those prescribed. At present all petroleum carriers are exempt from that order.

The order, sought in this writ of error to be set aside, was promulgated after a request of a change in rates initiated by Groendyke Transport, Inc., a common carrier. It filed an application with the Commission asking permission to offer its services at rates considerably below that applicable to the transportation of bulk petroleum.

The application was met by two types of reaction from Groendyke's competitors. Plaintiffs in error here filed protests and asked for suspension of the reduced rates. Others, such as Western Tank Truck Carriers' Conference, Inc., and Colorado Motor Carriers' Association, filed with the Commission similar rates or rates slightly lower than Groendyke. Both the protestants and those who followed Groendyke's strategy and filed their own requests for lower rates had placed before the Commission a common complaint, namely: that the proposed rates of Groendyke had set the stage for the development of a rate war; and that the rates were not reasonable or just and were non-compensatory. Without any hearing, and with only letters and the pleadings and some purported rate comparisons submitted by Groendyke, and further without adequate findings of

fact, the Commission entered its order and decision No. 60391 which, in part, is as follows:

"We do not believe that the public interest would be served by a denial of the proposed rates. Further, we do not now believe it to be *in the public interest to continue in force* the provisions of our order, in this case, as it *pertains to the rates, rules and regulations prescribed* by us for application in connection with the transportation of petroleum and petroleum products, in bulk, in tank trucks and/or tank trailers, between points in the State of Colorado. * * *" (Emphasis supplied.)

The order further provided:

"2. This order shall become effective forthwith.

"3. The prescribed rates, rules and regulations for the transportation of petroleum and petroleum products, in bulk, in tank trucks and/or tank trailers, between points within the State of Colorado *be stricken* from our order, as amended, in case 1585, and be of no further force and effect on and after April 11, 1963.

\* \* \*

"6. The protests and petition for suspension are hereby denied." (Emphasis supplied.)

Petitions for "rehearing" (although no hearing was ever held) were presented to the Commission and summarily denied. The Commission did not, as it had done in all previous amendments and alterations of its orders in connection with case No. 1585, prescribe any new rates to become effective from and after the date of its order or on any date. Likewise, there were no requirements for the common carriers to publish tariffs in conformance with any prescribed rates and charges, nor were minimum rates prescribed for the competing private carriers below which they could not contract. Also missing from the order was the usual language contained in all previous orders requiring all carriers, common or private, not to demand, charge or collect rates and charges greater or less than those prescribed.

It appears that the Commission intended to and did

in fact "cut loose" the transportation of petroleum and petroleum products from any further regulation of the Commission other than to require that whatever charges the carrier initiated be filed with the Commission. We conclude such to be the legal effect of the Commission's action because it ordered two sets of proposed rates (Groendyke's and Western's) to be effective immediately and that other carriers, common and private, *could* publish either set of rates if they did so within ten days. We deem this to result in at least two sets of rates and possibly three if other carriers did not choose to file tariffs in a timely manner, thus meeting the Groendyke and Western rates. And there is no doubt that there has been a Commission declaration, in any event, that there would not be established any prescribed rates nor minimum rates for private carriers.

That the order itself contained evidence of rate-cutting and an invitation to engage in a rate war cannot be doubted by other portions of the Commission "findings" in its decision, as for example:

"Western stated, in a letter dated March 15, 1963, its reasons for publishing the proposed rates were:

'These reduced rates are published and filed to combat *unwarranted* and vicious *rate cutting tactics* which have placed our member-carriers in the untenable position of not being able to petition for suspension without jeopardizing shipper relations, and also of being unable to retain their share of the available business by merely meeting the reduced rates.

'We readily admit that the effectiveness of either the Groendyke or our rates *will so far lower the general level* of refined petroleum products *rates* in Colorado that it is extremely doubtful the *carriers will be able to exist for any great length of time under such a depressed scale.* However in order to retain the more lucrative interstate hauling we are compelled to attempt continued operation in Colorado intrastate traffic. Those

carriers having only Colorado intrastate authority are indeed in a precarious situation.' (Emphasis supplied.)

"Western expressed doubt in its letter that 'the carriers will be able to exist for any great length of time under such a depressed scale.' No information was given as to revenue or costs of these carriers to bear out this dire prediction. It doesn't appear logical that the costs of participants in Western's tariff should be so much higher than those of Groendyke as to result in the collapse of the Colorado intrastate carrier of petroleum and petroleum products. However, if such is the case, it is self-evident that the operations of those carriers are grossly inefficient when compared to Groendyke's operations. An umbrella should not be held over the inefficient carrier to the detriment of the shipping public."

FIRST QUESTION TO BE DETERMINED:
*CAN THE COMMISSION REFUSE TO SET PRESCRIBED RATES FOR COMMON CARRIERS AND MINIMUM RATES FOR PRIVATE CARRIERS?*

■ This question is answered in the negative.

The Commission's duties are set forth in the considerable number of sections in chapter 115, C.R.S. 1963. We call attention to some as particularly pertinent as follows:

"115-3-2. *Regulation of rates—correction of abuses.*— The power and authority is hereby vested in the public utilities commission of the state of Colorado, and it is hereby made its duty to adopt all necessary rates, charges, and regulations to govern and regulate all rates, charges and tariffs of every public utility of this state to correct abuses, and prevent unjust discriminations and extortions in the rates, charges and tariffs of such public utilities of this state, and to generally supervise and regulate every public utility in this state and to do all things, whether specifically designated in articles 1 to 7 of this chapter, or in addition thereto, which are necessary or convenient in the exercise of such power,

and to enforce the same by the penalties provided in said articles, through proper courts having jurisdiction.

"115-11-5. *Commission to make rules—prescribe rates.* (1) The commission is hereby vested with the power and authority and it is hereby made its express duty to prescribe such reasonable rules and regulations covering the operation of private carriers by motor vehicle as may be necessary for the effective administration of the provisions of this article.

"(2) Every private carrier is hereby forbidden, by discrimination or unfair competition, to destroy or impair the service or business of any motor vehicle common carrier or the integrity of the state's regulation of any such service or business; and to that end, the commission is hereby vested with power and authority and it is hereby made its duty to *prescribe minimum rates, fares and charges to be collected by private carriers when competing with duly authorized motor vehicle common carriers, which rates, fares and charges shall not be less than the rates prescribed for motor vehicle common carriers for* substantially the same or similar service. * * *"

██ It needs no citation of authority to support a statement that motor carriers for hire, of whatever commodity, are public utilities. It is of particular significance that the legislature, in each of the two above sections, not only granted "power and authority" but also made it the Commission's *duty* to adopt rates. Reading 115-11-5 it would be impossible for the Commission to carry out a duty to prescribe minimum rates for private carriers if it established no rates for common carriers. The one duty is tied in with the other, and the prescribed rates for one class are the basis for the minimum rates for the other. In the face of these sections and the mandatory language therein, the Commission has no authority to discontinue "in force the provision of our order, * * * as it pertains to rates, rules and regulations * * * in connection with the transpor-

tation of petroleum and petroleum products, in bulk, in tank trucks and/or tank trailers * * *."

█ We add the additional comment that it not only cannot be done under the law but there is no evidence in this record that it is in the public interest or in the interest of the carriers who are entitled to rates which are fair and just, non-confiscatory, and fully compensatory, to discontinue its rate-making authority and duty.

SECOND QUESTION TO BE DETERMINED:

*CAN THE PUBLIC UTILITIES COMMISSION CHANGE, ALTER, AMEND OR STRIKE AN ORDER PREVIOUSLY IN FORCE WITHOUT A HEARING WHEN REQUESTED?*

█ This question is answered in the negative.

We again call attention to a pertinent section of the statutes of Colorado, particularly C.R.S. 1963, 115-6-12, as follows:

"Alteration or amendment of order.—The Commission, at any time upon notice to the public utility affected, and *after opportunity to be heard* as provided in the case of complaints, may rescind, *alter or amend any order or decision* made by it. Any order rescinding, altering or amending a prior order or decision, when served upon the public utility affected, shall have the same effect as original orders and decisions."

As we analyze that section, it is squarely applicable in the situation here. The action was, as noted, in case 1585. It did affect all of the public utilities covered thereby. It did rescind, alter and amend orders and decisions previously made in full force and effect from 1957 until the date of the Commission's order herein. There was *no opportunity to be heard* as in the case of complainants, and the notice and hearing procedures provided *in case of complaints* as set forth in 115-6-8 and 115-6-9 were not accorded any one.

Apparently the Commission has predicated its action and construed its authority by giving emphasis to the word "necessary" as contained in some of the sections

of chapter 115 alluded to herein. It seemingly has taken the position that if it "declares" it "not necessary" it need not then prescribe rates. We do not so interpret the law.

The legislature itself has declared *the necessity* and *the duty* and left to the Commission the determination of a rate that is fair to the public and sufficiently compensatory to the utility to insure a fair return on its investment. Regulation — not non-regulation — has been declared to be in the public interest. The Commission has been charged with the duty to carry out its mission in *two* areas, to-wit: to protect the public and to prevent destructive rate-making which could result in non-availability of the service to the public.

In any event this record, such as it is, belies any conclusion that regulation of the transportation products "is no longer necessary." Every pleading — indeed even the rates request by Groendyke and Western — spelled out a competitive situation that cried out for regulation. To be sure, there was probably some good reasons to consider adjustments in the rates, but certainly that does not call for complete exemption of this commodity from rate regulation.

In order also to further explore the validity of the Commission's action, we are called upon to determine whether another order previously issued in case No. 1585 can be resorted to by the Commission to support its action. Pursuant to the rule-making power which is vested in the Commission by the legislature (though it can never be said that such rules can contravene the statutes), the Commission published a "Procedure to change rates prescribed under case No. 1585." This is a rather lengthy procedural rule, and for our purposes need not be quoted in full. We note, however, that nowhere in the procedure is there a provision for opportunity to be heard in the event of a change in the rates. We now hold that insofar as the Commission

250

purported to eliminate the necessity of a hearing as prescribed in 115-6-12, such order was defective.

■■■ We also note, however, that the Commission violated its own procedural rules in the case in the following particulars:

1. Commission Rule 18 C (1) (a) provides in pertinent part:

\* \* \*

"If the Commission, after investigation of the proposed change and after examination of protests, if any are received, believes that the public convenience and necessity will be served by approval of the proposed *tariff*, the Commission *will,* on the day following the protest deadline, enter an order in Case No. 1585 prescribing the *rates,* rules, or regulations contained in such *tariffs* as the rates to be charged or the practices to be followed by the initiating carrier and *all other motor vehicle common carriers* in competition with said initiating carrier, and which *prescribed rate,* rule, or regulation shall also be the *minimum* rate, rule, or regulation to be charged by all competing private carriers. \* \* \*" (Emphasis supplied.)

As we interpret the now existing Commission order, this order as it pertains to rates is "stricken" or no longer "in force." If it is still the rule of the Commission, the decision is in conflict with it.

Also Rule 18 C (1) (b) provides:

"WHEN COMMISSION WILL SUSPEND. If the Commission received protests at least ten days prior to the effective date of the proposed change, sufficient in number and importance, in the judgment of the Commission to warrant further investigation, the Commission will suspend the effective date of the proposed change until further order of the Commission."

By this rule the Commission has given itself wide latitude, unlimited discretionary power, and no guidelines for the exercise of "its judgment." But from what we see in the record, it is difficult to understand how

the Commission *determined* that the protests were not "sufficient in number and importance" to warrant a hearing, or further investigation, and that suspension of the requested Groendyke rate change was not in order until its fairness could be determined.

 But aside from the application of the unambiguous language of the statutes, there is still a more cogent reason for the Commission being required to "afford opportunity to be heard" in a case such as this. There are serious allegations, even by carriers who have filed lower rates in conformance with the Groendyke rates, that they are in the midst of a "rate war." There are serious allegations by the Commission that if such is the case "it is self-evident that the operations of those carriers are grossly inefficient." There are substantial allegations in protests filed by other carriers that if the "Groendyke rates" do become the *prescribed rates* for all carriers, they are confiscatory. The allegations of some of the carriers were made with supporting data. The request of Groendyke was also made with supporting data. Statements, both of Groendyke and of other carriers, have been challenged by protestants on the one hand and by the Commission itself on the other. There has been no opportunity for cross-examination of any witnesses or for the sifting of the truth or falsity of the data in relation to innumerable other factors. The opportunity to file a protest does not comport with the "opportunity to be heard."

Likewise, what is there to enable us to perform our function on review? On the record here, consisting of letters, columns of figures and legal conclusions, we cannot determine on review:

(a) that the public interests is being served;

(b) that there are *no grounds* for a finding that the rates are non-compensatory and actually confiscatory;

(c) that the protests are not valid;

(d) that it is "self evident that protesting carriers are

grossly inefficient" and that regulation provides "an umbrella over the inefficient";

(e) that there is *no ground* for the "dire prediction" that the carriers will be unable to exist for any great length of time at such a depressed scale as proposed by Groendyke.

The review procedures provided to test the orders and decisions of the Commission are set forth in C.R.S. 1963, 115-6-15, in pertinent part as follows:

"* * * The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the order of the commission is just and reasonable and *whether its conclusions are in accordance with the evidence."* (Emphasis supplied.)

This section of the act also states:

"The findings and conclusions of the commission on disputed *questions of fact* shall be final and shall not be subject to review, except that, in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the constitution of the United States, or the constitution of the state of Colorado, the district court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the said constitutional question shall not be final. * * *" (Emphasis supplied.)

This section contemplates there be in the Commission's files some *evidence* to support a decision and order which the courts can review and which will enable the court intelligently to determine whether the Commission has exceeded its jurisdiction, abused its discretion, and whether its order and decision is warranted by the facts. Some of the questions of fact which

the Commission has cavalierly brushed off with an order "protests denied" are: 1. that competing carriers are in a rate war; 2. that such carriers cannot long continue under a depressed rate scale; 3. that the delicate competitive balance of rate structure between rail and motor carriers in the transportation of bulk petroleum is being destroyed to the detriment of rail carriers; 4. that Groendyke is not more highly efficient and other competitors are not less efficient as charged in the order; 5. that the request of Groendyke is not supported by complete financial facts and should be open to challenge and cross-examination.

All these allegations demand an opportunity to present evidence. They contemplate that by the production of documents, financial statements, expert opinion and pertinent cross-examination, a true and realistic rate schedule can eventually be determined. As was said in *Public Utilities Commission v. Loveland,* 87 Colo. 556, 289 Pac. 1090:

"* * * we conclude that the intent of the legislature was to empower us to set aside or modify orders of the commission if they are based on propositions of fact in support of which *there was no evidence,* but not to review findings of fact upon which the evidence was conflicting." (Emphasis supplied.)

We do not mean to declare here a hard and fast rule that the evidence in support of the Commission's order must always be testimonial and must always be obtained at a hearing. We recognize that the Commission can take notice of other evidence in its files, annual statements and data gathered through its own investigation. But if it had such evidence and relied upon it, it did not include it in the record as certified on certiorari in the District Court. Also such evidence, if relied on, does not justify a holding that because the protestants did not submit complete evidence in writing, their protests would not be considered. When one relies on a statute which provides "opportunity to be heard"

one is justified in believing that means opportunity to prove the allegations of the complaint or protest.

In a case reviewing an Interstate Commerce Commission decision, *Erie R. Co. v. United States,* 59 Fed. Supp. 748, a three-judge Federal court said:

"It has been many times decided that administrative orders, quasi-judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the 'indisputable character of the evidence;' or if the facts found, do not, as a matter of law, support the order made. Interstate Commerce Commission v. Louisville & N. R. R. Co., 227 U. S. 88, 91, 33 S. Ct. 185, 187, 57 L. Ed. 431. In the foregoing case, on page 91 of 227 U. S., at page 186 of 33 S. Ct., 57 L. Ed. 431, the Supreme Court further stated (referring to the statute there under consideration) that 'the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. A finding without evidence is arbitrary and baseless.

\* \* \*

"\* \* \* A decision which is not grounded on evidence fails to apply the standard of 'full hearing' set by Congress as a guide to the Commission in the performance of its quasi-judicial duties. \* \* \* Here it is impossible to say that the legislative standard has been properly applied. \* \* \*"

The judgment of the trial court is reversed and remanded with directions to enter a judgment setting aside and holding for naught decision No. 60391 of the Public Utilities Commission in case No. 1585. The Commission should be further ordered to suspend the rates filed by Groendyke and Western Tank Truck Carriers' Conference, Inc., and enter an order reinstating the prescribed rates for common carriers and minimum rates for private carriers of petroleum and petroleum products in bulk and in tank trucks and/or trailers in Colo-

rado; that the trial court further order the Commission to proceed to conduct hearings to determine the just and fair rates and appropriate orders prescribing the rates so found as those to be charged by common carriers and as the minimum rates for private carriers.

MR. JUSTICE FRANTZ concurs in the result.