COLORADO ENERGY ADVOCACY OFFICE, and Ann Caldwell, Plaintiffs-Appellants,

v.

PUBLIC SERVICE COMPANY OF COLORADO; Public Utilities Commission of the State of Colorado; and Commissioners Edythe S. Miller, Daniel E. Muse and Andra Schmidt, Defendants-Appellees.

No. 83SA476.

Supreme Court of Colorado,
En Banc.

June 24, 1985.

Rehearing Denied Aug. 19, 1985.

Fish & Kogovsek, D. Bruce Coles, Denver, for plaintiffs-appellants.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John E. Archibold, Asst. Atty. Gen., Denver, for defendants-appellees Public Utilities Com'n, Miller, Muse and Schmidt.

Kelly, Stansfield & O'Donnell, James K. Tarpey, Denver, for defendant-appellee Public Service Co.

DUBOFSKY, Justice.

The Colorado Energy Advocacy Office and Ann Caldwell (plaintiffs) appeal a decision of the District Court for the City and County of Denver affirming a decision of the Public Utilities Commission (PUC) that a gas cost tariff for the Public Service Company of Colorado (PSCo) was adopted legally despite questionable ex parte communications and did not constitute retroactive ratemaking or an unlawful delegation of PUC powers. We affirm the judgment of the district court.

In 1974, PSCo responded to rising natural gas costs by filing a tariff that included a gas cost adjustment (GCA). The GCA adjusted monthly the base rate charged for gas by adding to the rate an increment derived from the actual cost of gas during the most recent test year for which data was available. The test year was the year ending two months before a given GCA went into effect; thus, the GCA for March would be based on actual gas costs over the twelve months ending the previous January.

In practice, PSCo discovered that gas prices rose so quickly that the test year did not reflect accurately actual gas costs for the month in which the GCA was effective, and PSCo was failing to recover its actual gas costs each month. Although the company might recover too much or too little in a given month, PSCo studies predicted a large overall loss due to the impreciseness of the GCA. Therefore, in May 1979 PSCo filed a new proposed tariff with the PUC. The new tariff required a two-step calculation of the GCA. First, the base rate gas cost was subtracted from the actual purchased gas cost expected for the month, based on suppliers' invoices and "any appropriate adjustments." The resulting purchased gas adjustment added to the base rate [1] would predict PSCo's expected gas

---

1. The base rate for determining rates charged to customers includes all of the utility's capitalized costs as well as its ongoing costs for gas supplies. The base rate gas cost is a part of the base rate, calculated on a historic test year basis.

cost for the month and therefore should reimburse PSCo for gas costs incurred. The second step added to or subtracted from the GCA the under or over recovery of actual gas costs incurred two months previously. Thus, a tariff filed in February for the month of March would take into account the under or over recovery of gas costs actually incurred in January. By the end of March, PSCo would recover an amount very close to the actual gas costs incurred in January.[2] The PUC approved the new PSCo tariff in June 1979 after a public hearing. The PUC required that PSCo submit to quarterly hearings and audits on the GCA, reserving the right to require a refund of the GCA if the PUC discovered "any inaccuracies or improprieties."

The plaintiffs filed a complaint with the PUC in April 1980, alleging certain flaws in the procedure by which PSCo's tariff was adopted, and also that the tariff constituted retroactive ratemaking and an unlawful delegation of PUC authority in violation of the state constitution. The PUC referred the matter to Hearing Examiner Trumbull, who issued a recommended decision to the PUC in April 1981. Examiner Trumbull upheld the legality of the GCA tariff; however, he recommended two major revisions. First, the hearing examiner recommended that the provision of the tariff allowing "any appropriate adjustments" to the calculation of purchased gas costs should itemize the adjustments that might be made to the estimate. The examiner listed eight factors requiring appropriate adjustments in the purchased gas cost estimate, based on PSCo's experience in making adjustments since June 1979. The second change proposed by the hearing examiner completely revised the method by which under or over recovered gas costs were charged to customers. Because the GCA required customers in a given month to pay for under recovery that occurred two months previously, customers joining the

system were charged in their first two months for gas costs incurred before they bought any gas from PSCo. Similarly, those who went on vacation for a month or used less than their proportionate amount of gas for some other reason would be charged two months later for the unrecovered costs of gas they did not use. In order to remove this inequity, Examiner Trumbull recommended that the under or over recovered gas costs be calculated and charged in a given month according to the amount of gas actually used by each customer two months earlier, rather than according to the amount of gas used by the customer in the given month. The examiner also recommended that PSCo be required to refund net overcharges to customers whose gas consumption had differed significantly from the average consumption in the system since June 1979 because these customers might have been significantly overcharged for unrecovered costs on gas they did not use.

The plaintiffs and PSCo filed exceptions to the examiner's proposed decision. PSCo asserted that the specific list of appropriate adjustments for the purchased gas cost estimate was too restrictive and the reimbursement order for calculating amounts owed to customers was too burdensome. PSCo also maintained that the prospective change in the tariff to charge unrecovered gas costs according to customers' actual usage two months earlier would be impractical, requiring massive reprogramming of PSCo's computers to keep track of new and terminated customers and to maintain active files of past gas consumption. The plaintiffs' exceptions reiterated the allegations made in their original complaint. In addition, the plaintiffs requested a clarification of the reimbursement order, arguing that most PSCo customers would have significant mismatches between their gas consumption and the system's consumption

---

**2.** PSCo's recovery for January gas costs still would not be accurate. The rate charged in March to recover January costs would be based on a prediction of March gas usage. If March gas usage were greater or less than predicted, the recovery for January gas costs accordingly would be greater or less than actual costs.

each month, so PSCo should be required to reimburse all overcharged customers.

The PUC denied the plaintiffs' exceptions and granted PSCo's exceptions in part. The PUC concluded that requiring PSCo to calculate the unrecovered gas charge according to customers' actual usage two months previously would be an undue burden on the company, and therefore rejected Examiner Trumbull's proposals that the method of calculating the GCA be revised and reparations be required. However, the PUC did revise the tariff to limit "appropriate adjustments" to the purchased gas cost to ten itemized factors.[3]

In finding that the examiner's proposal would not be cost-effective, the PUC quoted potential costs for PSCo customer account reviews and amounts for potential PSCo customer refunds that could not have been derived from the pleadings or hearing record.[4] The plaintiffs asserted that the information must have been obtained from ex parte contacts and requested that the PUC reconsider its decision without relying on the ex parte information. The PUC granted reconsideration and remanded the case to Examiner Trumbull to reopen the record "to ensure the right of all parties to fully cross-examine cost data, and explore the cost effectiveness" of the proposed refund procedure.

Because Examiner Trumbull had left his position with the PUC, the remanded case was heard by Examiner Temmer in December 1981. Testimony at the hearing indicated that a PUC staff member obtained the ex parte data and presented it to one of the commissioners in private and to all the commissioners at an open meeting about which the plaintiffs were not notified. The staff member calculated the potential refund amounts for the refunds required under the hearing examiner's proposed decision from information in his possession. His estimate of the cost of customer account reviews was verified by a financial analyst at the Public Service Company. Testimony by the staff member and the PSCo analyst at the hearing revealed that their estimates of the cost of customer account reviews evaluated completely different costs, although the PSCo analyst's result had confirmed the staff member's result; the staff member estimated the cost of calculating customer refunds based on known customer data and the PSCo analyst estimated the cost of retrieving

---

**3.** The factors to be considered in making "appropriate adjustments" under the new tariff approved by the PUC included the eight factors listed in Examiner Trumbull's recommended decision, plus two more mentioned by PSCo in its exceptions to the recommended decision. Those factors are:

1. Costs of gas purchased for underground storage which will not be withdrawn or injected, during the time the resulting GCA amount becomes effective.
2. Known increases in prices of natural gas suppliers.
3. Difference between bookings of gas costs based upon preliminary meter reading and final invoices based upon final analyses of meter reading charts.
4. Allocation of monthly demand charges on basis of estimated demand for the billing period.
5. Lost and unaccounted for gas.
6. To eliminate Gas Research Institute charges.
7. Incremental pricing effects.
8. Gas used for interdepartmental purposes.
9. Accounting or billing errors.

10. Billing cycle adjustments.

**4.** The PUC decision, dated August 18, 1981, stated:

For example, at the end of 21 months of the new GCA methodology, the average ... customer would have owed Public Service $.82, or at the end of 22 months, would have been entitled to a refund of $.31, based on average system residential consumption. Either of the foregoing account reviews were estimated by Public Service to cost approximately $75.00. ... To require account review will present an unwarranted administrative burden to Public Service without meaningful monetary benefits to the customers of Public Service. In other words, the Commission finds that the proposed account review procedure will not be cost effective.

The $0.82 and $0.31 figures were taken directly from a PUC staff member's analysis, not in the record then before the PUC, of average overcharges. The staff member's analysis extended to 23 months, and the PUC gave no explanation for why it ignored the analysis' estimate that the average customer would be entitled to a refund of $5.37 after 23 months.

individual customer data from PSCo records.

Examiner Temmer received evidence from the PUC staff analyst, a Colorado Energy Advocate Office analyst and a PSCo analyst about the amount of overcharges that might be refunded to customers under Examiner Trumbull's proposed decision. The plaintiffs' analyst assessed the costs of recovering customer billing information from PSCo files. The plaintiffs cross-examined PSCo representatives about the costs of recovering such data and the costs of reprogramming PSCo computers prospectively to calculate unrecovered gas cost charges as would be required under Examiner Trumbull's proposed decision.

In April 1982, Examiner Temmer determined that Examiner Trumbull's proposed refund would not be cost-effective and therefore the PUC's first decision was justified. The PUC adopted Examiner Temmer's recommended decision in June 1982. The plaintiffs sought review of the PUC decisions in Denver district court. The district court issued a brief decision affirming the PUC decisions, and the plaintiffs appeal, asserting that the PUC decision denying refund of overcharges was fatally flawed by ex parte communications with the PUC staff and PSCo, that the GCA tariff constituted retroactive ratemaking in violation of the constitutional prohibition against retroactive legislation, and that the tariff provision allowing PSCo to adjust its purchased gas cost estimate without prior approval by the PUC constitutes an illegal delegation of PUC authority to a private party.

## I.

The plaintiffs maintain that the PUC decision not to grant a refund of overcharges should be vacated because it is based on information obtained by the PUC outside of the formal hearing on the plaintiffs' complaint. They assert that such ex parte

communication violates the State Administrative Procedure Act (APA), § 24–4–105(14), 10 C.R.S. (1982), which provides that "[n]o ex parte material or representation of any kind offered without notice shall be received or considered by the agency or by the hearing officer." The plaintiffs argue that because the PUC originally received the data developed by the PUC staff member and obtained from PSCo through ex parte contacts, the PUC should not consider the data even after the plaintiffs had an opportunity to cross-examine the proponents and rebut the evidence.

In adjudicatory proceedings such as the PUC hearing of complaint, an agency may not base its decision on ex parte information of which the parties are not given notice and an opportunity to cross-examine or rebut. *Cordova v. Lara,* 42 Colo. App. 483, 600 P.2d 105 (1979); *Zuviceh v. Industrial Commission,* 37 Colo.App. 249, 544 P.2d 641 (1975); *Puncec v. City & County of Denver,* 28 Colo.App. 542, 475 P.2d 359 (1970); *see Peoples Natural Gas v. Public Utilities Commission,* 626 P.2d 159 (Colo.1981). Decisions in adjudicatory proceedings must be made on a public record to assure that a reviewing court will be able to determine whether there was sufficient evidence to support the agency decision. *Service Supply Co. v. Vallejos,* 169 Colo. 14, 452 P.2d 387 (1969); *Consolidated Freightways Corp. v. Public Utilities Commission,* 158 Colo. 239, 406 P.2d 83 (1965); *Interstate Commerce Commission v. Louisville & Nashville Railroad Co.,* 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913); *Home Box Office, Inc. v. Federal Communications Commission,* 567 F.2d 9 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

The PUC recognizes the general requirement that state agencies must make their decisions on the basis of the public record compiled with the participation of all parties, but maintains that a provision of the Public Utilities Law exempts the PUC from section 24–4–105(14).[5] The PUC asserts

---

5. Under section 40–6–101(1), 17 C.R.S. (1984), the APA applies to the PUC, but any specific provision of articles 1 to 13 of title 40 controls.

that it may base its decision on information it obtains in any manner because the statute designating the PUC record for court review provides:

> In case of an action to review an order or decision of the commission, a transcript of such testimony or the affidavits or other evidence under the shortened or informal procedure, together with all exhibits or copies thereof introduced and all information secured by the commission on its own initiative and considered by it in rendering its order or decision, and the pleadings, record, and proceedings in the case, shall constitute the record of the commission.

§ 40–6–113(6), 17 C.R.S. (1984).

■ Section 40–6–113(6) acknowledges that the PUC may rely on evidence other than that obtained at a formal hearing, thus allowing the PUC to consider a broader range of information in making an adjudicatory decision than that allowed by strict application of the APA.[6] This court has recognized that the PUC at times may have a duty to investigate on its own. *Ohio & Colorado Smelting & Refining Co. v. Public Utilities Commission,* 68 Colo. 137, 187 P. 1082 (1920) (ratemaking case); *see Consolidated Freightways Corp.,* 158 Colo. at 253, 406 P.2d at 90 (PUC may consider evidence obtained through its own investigation). However, the PUC's power to investigate on its own does not remove it completely from the prohibition against ex parte communication. For example, in *Peoples Natural Gas v. Public Utilities Commission,* 626

P.2d at 163, we recognized that the PUC was subject to the APA's prohibition against ex parte communications when the PUC was accused of ex parte contact with the attorney for a party to a proceeding.[7] Therefore, the PUC's contact with PSCo in the instant case, even though made through an intermediary staff member, was clearly improper.

■ Further, none of the evidence about the cost-effectiveness of a PSCo refund was included in the record upon which the PUC based its first decision. Although section 40–6–113(6) allows the PUC to consider information secured on its own initiative, that information is to be included in the PUC record. In addition, section 40–6–109(2), governing PUC review of decisions proposed by hearing examiners, provides that the PUC should base its decision "either upon the same record or after further hearing,..." and section 40–6–109(5) allows for the informal taking of evidence by affidavit only in "noncontested or unimposed proceedings." Thus, the statutory scheme for PUC adjudicatory decisions contemplates that decisions on contested matters will be made on the basis of a formal record. Therefore, we conclude that section 40–6–113(6), while recognizing that the PUC may obtain information on its own investigation, requires that the PUC place all information under consideration in the public record and provide an opportunity for the parties to comment thereon. *See Home Box Office,* 567 F.2d at 54–56; *Sangamon Valley Television Corp. v. United States,* 269 F.2d 221 (D.C.Cir.1959); *Love v.*

---

**6.** Compare section 24–4–105(14), 10 C.R.S. (1982), which provides:

> For the purpose of a decision by an agency which conducts a hearing or an initial decision by a hearing officer, the record shall include: All pleadings, applications, evidence, exhibits, and other papers presented or considered, matters officially noticed, rulings upon exceptions, any findings of fact and conclusions of law proposed by any party, and any written brief filed. The agency or hearing officer may permit oral argument. No ex parte material or representation of any kind offered without notice shall be received or considered by the agency or by the hearing officer....

**7.** The PUC separates the staff who participate in a hearing from the staff who advise the PUC on its decision. Ex parte communication from staff participants would be as improper as ex parte communication from any other party. *See Peoples Natural Gas v. Public Utilities Commission,* 626 P.2d at 163. In the present case, uncontested evidence at the hearing before Examiner Temmer established that the PUC staff member who advised the PUC was not aware of the staff's participation in the proceeding. Therefore, the PUC did not receive advice improperly from staff participants.

*Mississippi State Board of Veterinary Examiners,* 230 Miss. 222, 92 So.2d 463 (1956); *English v. City of Long Beach,* 35 Cal.2d 155, 217 P.2d 22 (1950).

 Here, the hearing conducted by Examiner Temmer on reconsideration of the PUC's decision cured the impropriety of the ex parte communication with the PUC. At the hearing, the plaintiffs cross-examined PSCo and PUC representatives on the information given to the PUC ex parte and presented their own analysis and data in rebuttal. This process placed in the public record all of the evidence propounded by both sides on the issue of cost-effectiveness and allowed the plaintiffs to consider and rebut the evidence previously received by the PUC in secret. Therefore, the PUC made its final decision appropriately on the basis of a public record. *See Home Box Office v. FCC,* 567 F.2d at 58–59 (ex parte contacts to be cured by supplemental proceeding); *cf. Zuviceh v. Industrial Commission,* 37 Colo.App. 249, 544 P.2d 641 (subsequent hearing at which party had no chance to cross-examine or determine bias did not cleanse record of taint of ex parte phone conversation); *Thompson v. Industrial Commission,* 33 Colo.App. 369, 520 P.2d 139 (1974) (Industrial Commission review of record not containing ex parte information received by hearing examiner did not cleanse record of taint of ex parte information). As the PUC findings on cost-effectiveness are supported by evidence in the record, they must be accepted by this court. *Morey v. Public Utilities Commission,* 629 P.2d 1061 (Colo.1981); *Answerphone, Inc. v. Public Utilities Commission,* 185 Colo. 175, 522 P.2d 1229 (1974).

### II.

Because the GCA is determined in part by recovery of costs incurred two months earlier, the plaintiffs maintain that the tariff operates retroactively, in violation of article II, section 11 of the Colorado Consti-

tution.[8] This court has recognized that ratemaking is a legislative function, subject to the constitutional prohibition on retroactivity. *Peoples Natural Gas Division v. Public Utilities Commission,* 197 Colo. 152, 590 P.2d 960 (1979). Both the PUC and the district court, however, concluded that the GCA tariff was purely prospective in operation because it was put into effect two months after approval and each monthly tariff as approved applies only to gas consumed in the next month. This reasoning is persuasive.

 It is well established in Colorado that a law is retrospective in operation if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Denver, South Park & Pacific Railway Co. v. Woodward,* 4 Colo. 162, 167 (1878); *see P-W Investments, Inc. v. City of Westminster,* 655 P.2d 1365 (Colo.1982); *Continental Title Co. v. District Court,* 645 P.2d 1310 (Colo.1982); *Department of Social Services v. D.A.G.,* 199 Colo. 315, 607 P.2d 1004 (1980). The GCA tariff does not impair a vested right or impose a new duty with respect to past transactions, for the tariff as imposed applies only to future gas consumption. Such a tariff does not constitute retroactive ratemaking. *See Peoples Natural Gas Division v. Public Utilities Commission,* 197 Colo. 152, 590 P.2d 960 (1979); *Public Service Co. v. Federal Energy Regulatory Commission,* 600 F.2d 944 (D.C.Cir.), *cert. denied* 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); *Jersey Central Power & Light Co. v. Federal Energy Regulatory Commission,* 589 F.2d 142 (3d Cir.1978), *cert. denied,* 444 U.S. 880, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979); *Maine Public Service Co. v. Federal Power Commission,* 579 F.2d 659 (1st Cir.1978); *Virginia Electric & Power Co.*

**8.** Article II, section 11 of the state constitution provides:

No ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly.

*v. Federal Energy Regulatory Commission,* 580 F.2d 710 (4th Cir.1978).

■ The plaintiffs rely on *In re Central Vermont Public Service Corp.,* 144 Vt. 46, 473 A.2d 1155 (1984), in which the Vermont Supreme Court held that a tariff imposing a surcharge or credit on gas rates to reconcile annual over recovery or under recovery of gas costs by the company was illegal retroactive ratemaking that exceeded the Public Service Board's authority. That case differs significantly from the present case because the Vermont Public Service Board is a creature of statute, required to approve all rates before they go into effect. The Colorado PUC is given power by the Colorado Constitution, Colo. Const.Art. XXV, and its power is equivalent to that of the legislature except as limited by statute. *Miller Bros., Inc. v. Public Utilities Commission,* 185 Colo. 414, 525 P.2d 443 (1974). Rate changes may take effect automatically upon notice to the commission and the public, or under an order of the PUC. § 40–3–104, 17 C.R.S. (1984). Therefore, the power of the PUC to order automatic changes in GCA tariffs is greater than that of the Vermont Public Service Board.

### III.

■ The final argument made by the plaintiffs is that the provision of the GCA tariff allowing "any appropriate adjustments" to be made to the purchased gas cost component of the tariff constitutes an illegal delegation to PSCo of the legislative authority of the PUC. Legislative authority may not be delegated to private parties to serve private interests. *Olin Mathieson Chemical Corp. v. Francis,* 134 Colo. 160, 301 P.2d 139 (1956). The PUC may not delegate to a utility the discretion to decide how much it will charge which customers. *Baca Grande Corp. v. Public Utilities Commission,* 190 Colo. 201, 544 P.2d 977 (1976). The GCA tariff as originally formulated granted PSCo the authority to implement adjustments that it determined would increase the accuracy of its purchased gas cost. The adjustments be-

came a part of the GCA tariff implemented on one day's notice each month. Data on the gas cost adjustments was submitted to the PUC and was subject to PUC review and audit on a quarterly basis. The PUC would order a refund if it found any "inaccuracies or improprieties" in the GCA tariff. A PUC staff representative testified that the staff reviewed the adjustments at each audit. This procedure allowed a period of experimentation regarding appropriate adjustments to purchased gas cost estimates, while retaining PUC control over the rates charged.

■ As revised by the PUC decision in this case, the GCA tariff now lists ten factors to be considered by PSCo in determining the purchased gas cost each month. Thus, the PUC has limited PSCo's discretion to an administrative calculation of its costs and adjustments each month. The tariff at issue does not constitute an unlawful delegation of PUC authority.

Judgment affirmed.