No. 17,113.

CITY AND COUNTY OF DENVER *v.* PEOPLE EX REL. PUBLIC UTILITIES COMMISSION ET AL.
(266 P. [2d] 1105)

Decided February 8, 1954.

42

Mr. JOHN C. BANKS, Mr. MALCOLM D. CRAWFORD, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy; Mr. WILLIAM T. SECOR, Assistant, for defendant in error Public Utilities Commission.

Messrs. AKOLT, CAMPBELL, TURNQUIST & SHEPHERD, for defendant in error Mountain States Telephone and Telegraph Company.

*En Banc.*

MR. JUSTICE BRADFIELD delivered the opinion of the court.

THIS case is here on a petition for a writ of certiorari by petitioner, the City and County of Denver, against respondents, the Public Utilities Commission of the State of Colorado and its individual members, and the Mountain States Telephone and Telegraph Company, a Colorado corporation, to review the findings and judgment of the District Court of the City and County of Denver, which had approved an order of the Public Utilities

Commission granting a tariff rate increase. The parties appear here as in the trial court and will be designated as Denver, Commission and Company.

On May 6, 1952, after a hearing thereon, the Commission fixed the fair value of the Company's Colorado property as of January 31, 1952 at $58,568,550 and ruled it entitled to a fair return of 6.35% thereon, and for $5,579,410, or 19.95% over and above the total intrastate operating revenues for the year as the increase in revenue to which the Company was entitled to enable it to realize such fair rate of return, Decision No. 38593. Thereafter on May 9, 1952 the Company filed with the Commission its proposed schedule of rate increases designated as P.U.C. Tariff No. 4. The Commission suspended the proposed tariff schedule and May 27 to June 3, 1952 held hearings thereon; and June 9 and 20, 1952 entered its order and supplemental order finding the Company's proposed tariff schedule "just, reasonable, non-discriminatory and non-preferential," and authorized the rates to become effective forthwith, Decision No. 38836. A petition by Denver for a rehearing was denied. Thereupon Denver filed its petition in the District Court of the City and County of Denver for certiorari and a hearing was had thereon, the court on December 18, 1952 entering its findings and decree affirming the Commission's order. Denver brings the cause here for review, and asks for a reversal of the judgment.

On review upon certiorari, under Rule 106 (4), R.C.P. Colo., courts are limited in their inquiry as to whether the Commission had exceeded its jurisdiction, had abused its discretion, or had regularly pursued its authority. *Public Utilities Commission v. Town of Erie,* 92 Colo. 151, 18 Pac. (2d) 906.

The making of rates to govern public utilities is held to be a legislative and not a judicial function. In Colorado that legislative function has been delegated to the Public Utilities Commission. '35 C.S.A., c. 137, §15;

*People ex rel. Public Utilities Commission v. Mountain States Tel. & Tel. Co.,* 125 Colo. 167, 243 P. (2d) 397.

The Commission having here found the Company was entitled to additional Colorado intrastate revenues, it became necessary for it to determine how the required earnings should be spread in rates to its various subscribers.

In *People ex rel. Public Utilities Commission v. Mountain States Tel. and Tel. Co., supra,* this court, overruling its prior decisions, recognized the state-wide basis for the fixing of intrastate telephone rates, and that the Public Utilities Commission is the sole agency authorized to regulate the telephone business and rates in Colorado. The Commission herein followed this "state-wide" basis for rate fixing, and adopted the "value of service" concept therefor. The trial court approved the Commission's action.

In their briefs the parties discuss the methods of telephone rate making, the "value of service" concept, and the "cost of service" concept. Denver does not here question the "state-wide" basis for rate making, but urges that whatever concept is adopted, it must be based on sufficient, objective, reviewable data, facts and figures therefor. Denver urges that the Commission here had no sufficient evidence for its order, and made no findings thereon, therefore, the Commission's order was arbitrary, capricious and unreasonable. Denver urges the trial court's approval of the Commission's order was error.

The Commission had jurisdiction to determine the applicable intrastate telephone rates and the method of computation therefor. Having previously determined the Company was entitled to a $5,579,410 increase in operating revenue, and approved the rate increase necessary therefor, the sole question now before us is, did the evidence presented support the order of the Commission and the judgment of the trial court?

To sustain its proposed tariff increases the Company

presented two of its engineers, tariff rate experts, who testified as to the "value of service" concept on a statewide basis, as applicable to Colorado. They regarded the "cost of service" concept by separated units as inapplicable in the determination of rates. Evidence was presented of the kinds of service and their rates, the differences in kinds of service, the average sizes and types of exchanges, their nature, properties, areas served, the demands for and uses of the several services by groups, their interrelation with other groups, the objectives sought, the insufficiency of revenues, and the rate increases applicable to the several types of service. These facts were related to, and considered in, the rate making decision. The witnesses admittedly base their proposed rate increases on said facts and on their studies, experienced judgment and ultimate opinions. Denver urges the facts so presented did not furnish sufficient, objective, statistical, reviewable data, facts and figures to support the Commission's order and trial court's judgment.

Denver's own rate expert admitted:

"* * * I believe there has never been and never will be devised exact formulas, mathematical or otherwise, upon which a rate determination can be made." And relative to the value concept, "* * * there is no yardstick of value that has ever been developed, it is only obtained by the exercise of experienced judgment and that is the only practical basis in the application of this component in the development of a rate structure." The Company's rate expert similarly testified, "There are no facts, no objective principles, or standards, on which a rate schedule is built."

The Company experts insist, for rate making, the value of service concept should be followed; that the cost of service studies are limited to the over-all business operation rather than separately considered for rate purposes. Denver's rate expert insists otherwise, that the two concepts, cost of service and value of service,

"are both important and they both must be given their full consideration in the final determination." These statements disclose the major difference here urged.

█ It is apparent that, as to exact statistical data, definite facts and figures to support the specific rate increases, such evidence cannot be had. No rate expert has suggested any such type of evidence, except only a separated cost of service study. The experts differed on the value of such cost studies. Both the Commission and the trial court heard the disputed issue and resolved same for the value of service concept and against the cost concept. Considerable factual evidence of the basis for the rate increases is in the record. To these facts the Company's rate experts applied their experienced judgment and ultimate opinions. We cannot say the factual evidence here presented was insufficient to support the Commission's order and the court's judgment. We will not disturb the trial court's findings thereon.

On the over-all state-wide basis the Commission found the rates fair, reasonable, non-discriminatory and non-preferential. Whether or not the Commission entered specific findings of fact supporting the exact rate increases becomes immaterial where the record discloses substantial evidence relating thereto. The Commission's general statement, findings and order here are sufficient. The other alleged errors become immaterial.

The Commission had jurisdiction and there is sufficient competent evidence to support its order. The trial court's judgment approving the Commission's order was right.

The judgment of the trial court is affirmed.

Mr. Justice Alter and Mr. Justice Holland dissent.

Mr. Justice Holland dissenting.

I cannot subscribe to the majority opinion which affirms a judgment that supports an order of the Utilities Commission, which is not based upon any reviewable,

objective findings. All we have before us is a discourse by the Commission about the elements of the two concepts of the methods entering into the fixing of a rate structure, namely, the concept of "cost of service" and the nebulous "value of service" concept, without findings based on any objective or reviewable facts concerning whether the proposed rates are fair, just, reasonable, equitable and non-discriminatory. In fact there is no reviewable order before us. A study of the entire testimony, as well as the so-called findings of the Commission, discloses an abject abdication by the Commission of its statutory duty and yielding to the self-serving pattern presented by the utility.

It is the accepted concept, and further advanced by the opinion of our court in the case of *People ex rel. v. Denver*, 125 Colo. 167, 243 P. (2d) 397, that the Public Utilities Commission, an arm of the state government, by the facilities it is supposed to have, can make, on behalf of the public, its own survey, investigation and analysis of the elements that should enter into the fixing of a fair and non-discriminatory rate for utilities operating within the state. When the power to fix utility rates was withdrawn from home-rule cities by the decision above referred to, and assuming that such cities could not effectively and efficiently accomplish such a task, this court said, "In the State of Colorado there are now fourteen home rule cities operating as such under Article XX of the Constitution of Colorado. To uphold the contention of counsel for the City, and Sarpy, in effect, would be to determine that each of these cities, in regulating telephone rates within their limits, should analyze and determine the property, revenues and expenses of the telephone company involved in the furnishing of telephone service in such city; that, by the exercise of some mysterious magic, they should segregate these from the properties, revenues and expenses of the company not directly involved in furnishing service to the city in question; and arrive at a rate which would yield a fair

return to the company on that portion of the property involved in providing such local service, and insure adequate protection to the consuming public. To assume that such a task can be accomplished effectively and efficiently, or at all, is manifestly absurd and ridiculous. In determining whether confiscation was brought about by any rate which might be established by any one of the fifteen separate regulating agencies which would thus be operating upon the business of the telephone company at the same time, a court would of necessity be required to go beyond city boundaries and inquire into the property, revenues and expenses of such utility on a statewide basis in order to do justice.

\* \* \*

" 'The contention that each city operating under the amendment may regulate public utilities operating within its borders, must apply to all alike. It follows that if it applies to telephones, it likewise applies to railroads. In case of these utilities one company may operate in all municipalities and throughout the state.

" 'It also follows that the one utility may be regulated by as many powers as there are cities of the specified class within the state, and by the commission as to all territory outside the cities. Each city may fix a different rate; the commission may fix a different rate from either city, for the same utility and for like service.

" 'Can it be denied that such a scheme would not infringe the equal rights of citizens of the state, or the well-being of the state. It would not only permit the corporation to do this, but would compel them to do so, regardless of the necessary discrimination between citizens of the state as to rates to be charged and regulations to be observed. It would require the deficiency of income from one city to be supplied by overcharge in other cities, or by the body of the state, outside the cities; for the constitution as construed by the courts, guarantees the reasonable expense of operation, and a reasonable return on the investment in public utilities in the matter

of fixing the rates to be charged. The logical result of such a plan, is confusion, chaos and injustice.' "

If the Commission does not have, and is not provided with the means and facilities to make its own investigation, and not have to rely upon the opinion of the utility involved, then it is a nonentity and of no real public benefit. When called upon to fix statewide rates or tariffs, it should be in a position to do so; if not, the interests of the public should not be imposed upon by the Commission acting solely as a referee between two proposed theories. It should openly and frankly say to its public, "We are not prepared to make a long and intensive study of the matters involved," and refrain from doing so until it can effectively operate as the agent of the people in the people's interest. In effect, the situation has not been remedied by the withdrawal of this rate-fixing question from the home rule cities, because, as it now appears, the city authorities would have been in just as good a position to say to the utilities, "We will accept your estimate," and fix the rates accordingly. The transfer of authority over such matters was well intentioned; however, the results are synthetic.

An apparent basic error on the part of the Commission arises from its confusion of the statewide jurisdiction on one hand, and a regulation with statewide rate making on the other. In May, 1952, the Commission on a hearing, and after receiving some competent evidence as to the question of a fair rate of return on the company's statewide valuation, determined that the company was entitled to receive 6.35 per cent as a fair rate of return on a valuation of $58,568,550, and that the sum of $5,579,-410 was an amount the company was entitled to receive from an increase in its revenue, or in other words, an increase of 19.25 per cent. Immediately thereafter the company filed a tariff with the Commission which contained the rates, tolls, rentals, charges, classifications, rules and regulations for interstate telephone service in Colorado, and in this tariff schedule was shown the pro-

posed distribution of the amount of the increased revenues.

The only facts and figures before the Commission on its hearing on this tariff schedule that is now before us, were the figures referred to on the question of rate of return considered by the Commission in arriving at the above amount of increase to which the company was entitled. Some of these figures relate, and properly so, to the elements of investment, costs, value of equipment, etc., and are not figures that in any way provide a basis for rate making on the "value of service" concept. I have no quarrel whatever with the proposition that the company or utility is always entitled to a fair return on its investment and operations; and where equitably distributed, it should be borne by the public participating in the use and benefits of such service without complaint. In that connection, however, I believe that the burden should be fairly and equally distributed, and not as it appears, where the deficiency of income in one group is made up by an over-charge on other groups, all of which has happened here, because it is undisputed that Denver situation alone, under this "value of service" concept approved by the Commission and confirmed by the trial court and this court that Denver has 44 per cent of the number of telephones in the entire state, and that the proposed increase in Denver rates is approximately 52 per cent. This discriminating situation in Denver arises from the Commission's acceptance of the utility rate engineer's statement to the effect that the more telephones in a city or group the greater the cost to operate the individual telephone. To a bystander, that sounds as if to say, the more business you have, the more revenue you take in, the less profitable it is to operate. On this theory, we at once have the situation, uncontradicted by anything in the record, that under the utility's formula as accepted in toto by the Commission, the larger places must pay for the smaller ones. A balance between these situations should be supported

by facts and not by the convenient striking of balances by the utility. The same bystander might suggest the following query: "If the rates throughout the state were fair, equitable and not discriminatory, and without general public complaint prior to the finding that the revenues were not sufficient to sustain a reasonable return on the investment, then why present a new and different schedule now instead of leveling off the 19.95 per cent increase in relative proportion on every phone used in the state?" If this was done, there could be no complaint from any one user that the necessary increase was more burdensome on him than anyone else.

The record discloses that the proposed increase varies from 12½ per cent in some instances, 35 per cent in other instances, and, in a few instances, of from 75 per cent to 223 per cent. The following is a fair example of the many instances which show the nature of the testimony of the utility rate engineer, and which was accepted in toto by the Commission: The witness testified, "We knew that business service greatly helps to carry the residence development * * *." There is absolutely no evidence presented to indicate *how* the company knows. "Q. How then, have you submitted to the Commission any figures to the extent of which business services are carrying residential services, or to the extent to which urban areas are carrying rural areas? A. No, I have no such figures. Q. You recognize the principle that the rates that are to be approved by the Commission are non-discriminatory, is that correct? A. That is correct. Q. And you have no figures, you have submitted no figures, as to how much business services are carrying residential services, or how much urban areas are carrying rural areas? A. That is correct."

Time and time again throughout the extended testimony of the utility's rate engineer we find expressions comparable to the following: "* * * then the next step in setting up the schedule initially that I *follow,* is to determine generally what I *think* the level should be for

the highest in the group then I get a skeleton for the overall statewide schedule by filling in the groups between, step by step for each class of service." This is a subjective approach based entirely upon what the company experts in their good judgment believed to be the fundamentals from their "long experience"; however, wholly without presenting any data, facts or figures from which the Commission could exercise its own independent judgment, which was doubly necessary in view of the fact that the Commission is shown to be impotent as to being prepared to make its own investigation, which the public expects it to do. When the Commission fails to tell us and make clear the evidentiary support for its findings, we are unable to exercise a judicial review in such cases. In cases too numerous to mention this court has so clearly settled the question that an order of an administrative tribunal not supported by sufficient or adequate findings of fact for this court to ascertain the objective principles upon which the Commission acted cannot stand. It need not again be said that it is insufficient for the Commission to merely state its conclusion without special findings of fact. This court has said in rate cases before the Public Utilities Commission, that the Act creating the Commission and defining its powers and duties requires this court to determine whether the order of the Commission is just and reasonable, and whether its conclusions are in accordance with the evidence. We further have said that the rule pertaining to reviews calls for a consideration of the evidence in order to determine whether there is competent testimony to support the findings of the Commission and whether the Commission's order is just and reasonable. We have not hesitated to set aside or modify the orders of the Commission if they were based on propositions in support of which there is no evidence. We conclude this phase by saying that the duty of review that is imposed upon us requires that the facts be found and the reasons stated.

If I entered into all the ramifications of the testimony in this case, this dissent would be unduly lengthened; however, I challenge any reading of the testimony that discloses any facts or figures, or anything else, except the experienced judgment of the utility's servants in the arbitrary schedule for distribution of the proposed rate increase. To my mind, and I do not believe that it can successfully be challenged, the "value of service" concept is not the only method of arriving at a fair and nondiscriminatory rate of increase, but is only one of the two elements, the other being "cost of service" concept, and it has been held that a public service company cannot make a difference in price according to the use made by the consumer, *nor is a discrimination properly based on the value of the service to the customer. Baily v. Fayette Gas-Fuel Co.*, 193 Pa. 175, 44 Atl. 251. "And from all the legion of cases upon this subject the distinguished counsel for the appellee have not been able to cite a single one in which a discrimination based solely on the value of the service to the customer has been sustained." *Bailey v. Fayette Gas-Fuel Co.*, 193 Pa. 175, 44 Atl. 251.

It is here contended that it is plaintiff in error's position that the rates involved should be on a "cost of service" basis. That is not the case. The city contends that "cost of service" is one element to be considered along with the "value of service" concept. The Commission adopted the utility's concept and made a finding, not on a conflict of realistic facts or data, but by acceptance of a theory promulgated by the utility's representatives or agents. Such testimony as was before the Commission cannot be dignified by the term "evidence." In the case of *Ohio and Colorado Smelting & Refining Co. v. Public Utilities Commission*, 68 Colo. 137, 187 Pac. 1082, it is said in speaking of the Commission: "It is not a court to consider and determine only that which is brought before it. It is a legislative agent, with certain administrative duties. One of its duties is to investigate and deter-

mine in the interest of the State. For this purpose the State has provided it with the proper engineers and other expert assistants to ascertain whatever facts may be necessary or important to justify a conclusion in any case, and this independent of, or in addition to, any testimony produced by the parties directly interested.

\* \* \*

"The Commission is not confined to technical rules of procedure, and as an investigator, its duty was to ascertain the facts so important and basic in reaching its conclusion."

"The prima facie presumption of the correctness of the acts of the public service commission applies only to the facts found; and where there is no finding by the commission on a necessary point, and the evidence certified in the record to the supreme court is indefinite and unsatisfactory, the commission's order will not be sustained." 43 Am. Jur., p. 724, §227.

The order here involved is not based on a conflict in evidence, rather on a conflict in theories. The experience, judgment and philosophy of rate making presented by the utility is interesting; however, orders of a Commission in these cases must have a basis that will not vary with the individual.

For the reasons stated herein, it is my opinion that the judgment of the district court affirming the findings and order of the Commission should be reversed.