The COLORADO OFFICE OF
CONSUMER COUNSEL,
Petitioner–Appellee,

v.

PUBLIC SERVICE COMPANY OF COLORADO, a Colorado corporation, Respondent–Appellant,

and

The Public Utilities Commission of the State of Colorado; and Commissioners Robert E. Temmer, Gary Nakarado, and Christine E.M. Alvarez, Respondents.

No. 93SA181.

Supreme Court of Colorado,
En Banc.

July 11, 1994.

As Modified on Denial of Rehearing
Aug. 15, 1994.

Gale A. Norton, Atty. Gen., Steven Erken-Brack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., James R. Lewis, Sr. Asst. Atty. Gen., Barbara C. Sohnen, Sp. Asst. Atty. Gen., Dept. of Law, Denver, for petitioner-appellee.

LeBoeuf, Lamb, Greene & MacRae, Kenneth V. Reif, Elizabeth A. Bryant, Denver, for respondent-appellant.

No appearance on behalf of respondents.

Justice VOLLACK delivered the Opinion of the Court.

This case is an appeal by the Public Service Company of Colorado (Public Service)[1] from an Order of the Denver District Court.[2] The district court determined that the Public Utilities Commission (PUC or Commission) engaged in unlawful retroactive ratemaking by awarding a bonus to Public Service after Public Service successfully pursued litigation against a natural gas supplier to recover excessive charges for natural gas. The district court also held that the granting of the bonus to Public Service was unjust and unreasonable. We affirm the decision of the district court.

## I.

This case dates back to the early 1970s. In the 1970s and 1980s, Public Service purchased most of its natural gas supplies from Colorado Interstate Gas Company (CIG). Public Service and its affiliates were, in turn, CIG's largest customer group. In the early 1970s, the United States was experiencing a shortage of natural gas in the interstate market. In 1973, CIG, believing its natural gas resources were insufficient for current and anticipated future demands, applied to the Federal Power Commission for approval of a customer-funded gas exploration program. Following extensive negotiations involving the Federal Power Commission, Public Service, the PUC, and other CIG customers, the parties entered into a "Gas Search Agreement" which was approved by the Federal Power Commission. Under the agreement, CIG would transfer its producing leases to a newly formed subsidiary, CIG Exploration, Inc., which would sell the former company-

owned production to CIG at prevailing rates, rather than the lower cost of service rates that CIG was entitled to receive under existing regulations. CIG would pass these higher rates through to its customers. Over five years, the program was designed to create a fund for gas exploration in excess of $50 million.

In 1978, the PUC expressed concern that Public Service had no incentive to obtain the lowest prices possible for its gas supplies. The PUC issued Decision No. C78–414, which struck a balance between the needs of the consumers and the needs of Public Service to shift the risk of escalating fuel costs to the ratepayers by allowing Public Service to continue to use gas cost adjustments, but by requiring Public Service to take "vigorous" legal steps to ensure that gas costs were kept to a minimum.

Congress passed the Natural Gas Policy Act in 1978.[3] The Act established certain maximum lawful prices for different categories of gas. Consistent with congressional intent to encourage exploration for new gas supplies, these prices were often higher than the area rates in effect at the time CIG's Gas Search Agreement was entered into. After passage of the Act, CIG began paying its affiliate, CIG Exploration, Inc., the highest applicable "maximum lawful" price for gas discovered under the agreement, and passing those higher costs through to its customers.

As a result of various legal actions taken by Public Service against CIG between 1982 and 1988, and subsequent stipulations reached later, it was determined that CIG had overcharged Public Service by $64.6 million, an amount that CIG agreed to pay to Public Service.[4] On November 9, 1990, Public Service filed an application with the PUC requesting authorization to use the CIG funds to reduce gas and electric rates, and also requesting permission to retain approxi-

---

1. The Public Utilities Commission does not join in this appeal.

2. We have jurisdiction to consider this appeal pursuant to § 40–6–115(5), 17 C.R.S. (1993).

3. 15 U.S.C. §§ 3301–3432 (1989).

4. CIG was ordered to pay the sum in four installments. By paying the last three installments early, CIG avoided certain interest charges, and ultimately paid only $56.9 million. CIG made payments from September 1990 to September 1991.

mately $5 million as a bonus payment for its efforts in obtaining the payments from CIG.[5]

The Colorado Office of Consumer Counsel (OCC) filed a protest to the application on November 16, 1990. The OCC requested that the proposed adjustments to the gas and electric rates be set for hearing and objected to the bonus award proposed by Public Service. On November 22, 1991, the PUC awarded Public Service a bonus of $3.27 million. The OCC subsequently filed a Petition for a Writ of Certiorari in the Denver District Court, requesting that the $3.27 million payment be set aside on the ground that it violated the prohibition against retroactive ratemaking. On May 19, 1993, the Denver District Court reversed the PUC's decision awarding the $3.27 million bonus to Public Service. The court ruled that allowing Public Service to keep a portion of the refund as a bonus constituted unlawful retroactive ratemaking. The court further found that the decision of the PUC awarding the bonus was unjust and unreasonable.

## II.

Public Service argues that the district court erred in concluding that the $3.27 million bonus payment constituted retroactive ratemaking because the funds it recovered from CIG represented the "settlement" of a lawsuit, not a rate change, and because its effect is prospective, not retrospective. Even if the payment can be properly described as retroactive ratemaking, Public Service argues in the alternative that the bonus should be classified under one of the several exceptions to the doctrine that prohibits retroactive ratemaking. The Office of Consumer Counsel argues that the bonus constitutes retroactive ratemaking and that no exception applies to this case.

### A.

■ The fixing of utility rates is a legislative function that the General Assembly has delegated to the Public Utilities Commission. § 40-3-102, 17 C.R.S. (1993); *Public Utils. Comm'n v. District Court*, 186 Colo.

278, 527 P.2d 233 (1974); *Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n*, 176 Colo. 457, 491 P.2d 582 (1971); *City and County of Denver v. People ex rel. Public Utils. Comm'n*, 129 Colo. 41, 266 P.2d 1105 (1954). Ratemaking is thus subject to the prohibition against retrospective legislation found in article II, section 11, of the Colorado Constitution. *Mountain States Tel. & Tel. v. Public Utils. Comm'n*, 180 Colo. 74, 502 P.2d 945 (1972). This provision of the constitution prohibits legislation that " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already passed.' " *Moore v. Chalmers–Galloway Live Stock Co.*, 90 Colo. 548, 554, 10 P.2d 950, 952 (1932) (quoting *Denver, South Park & Pacific Ry. Co. v. Woodward*, 4 Colo. 162, 167 (1878)). In the context of utility regulation, a charge by a utility is retrospective and constitutionally prohibited if it is connected to the past performance of the utility. *Peoples Natural Gas v. Public Utils. Comm'n*, 197 Colo. 152, 590 P.2d 960 (1979).

### B.

■ We conclude that the $3.27 million bonus awarded to Public Service constituted unlawful retroactive ratemaking. By not returning all of the CIG refund money to Public Service's customers and allowing Public Service to keep as a bonus a portion of the amounts unlawfully charged by CIG, the PUC is, in effect, retroactively raising the rates paid by the ratepayers during the 1982–1988 period by $3.27 million. The relevant tariff in effect during the 1982–1988 period authorized Public Service to collect only fuel costs from ratepayers. The tariff provided, in part,

### DETERMINATION OF GAS COST ADJUSTMENT AMOUNTS

The Gas Cost Adjustment or Purchased Gas Adjustment amounts will be determined by:

---

5. This amount represented a pure bonus for Public Service; it had already been reimbursed for

all of its attorney's fees and other costs associated with recovering the CIG refund.

1. Calculating the increased or decreased cost of gas purchased from Company's pipeline suppliers based on the volumes of natural gas purchased.

By returning to ratepayers $3.27 million less than all the overcharges collected from them, the PUC, in effect, imposed an additional charge on ratepayers for utility services provided between 1982 and 1988. Ratepayers paid for utility services in accordance with the tariff, but had a portion of their money diverted to Public Service's bonus. At no time between 1982 and 1988 did the tariff in effect permit Public Service to collect an incentive payment from ratepayers, or did the PUC authorize any bonus in addition to the amounts collected for utility service.

There is no question that most of the refund money must be returned to consumers in order not to violate the constitutional prohibition against retroactive ratemaking. It is therefore logically inconsistent to assert that, although most of the refund money must be returned to avoid retroactive ratemaking, Public Service should be allowed to keep some of it as a bonus, and that the bonus does not entail retroactive ratemaking.[6]

## C.

Public Service asserts in the alternative that, even if its retention of the bonus constitutes retroactive ratemaking, it should be permitted to keep the bonus under one of the exceptions that we have announced to the constitutional prohibition on retroactive ratemaking. We do not find that any of the exceptions are applicable to this case.

Public Service first cites *Peoples Natural Gas v. Public Utilities Commission,* 197 Colo. 152, 590 P.2d 960 (1979), which it claims allowed the utility company to charge its customers a surcharge for past services. In that case, the utility filed new rate tariffs with the PUC to pass through increased wholesale fuel costs to its customers. The proposed rates were contested, and the utility was not allowed to collect the rates during the challenge. However, the utility also filed a request for a surcharge to cover losses it would suffer between the time of filing and the time of the PUC's decision. The PUC later approved the new rate and allowed the utility to recover through a surcharge the uncollected costs incurred during the period the rates were contested. We rejected the challenge to the surcharge as retroactive ratemaking because the rates had been filed prior to the dispute's arising and therefore the utility was not attempting to recover costs incurred prior to the filing of the new tariff. Unlike Peoples Natural Gas, in this case, Public Service never filed with the PUC a rate increase representing the bonus it now seeks to retain, nor did it, prior to the litigation, request the funds contingent on the successful outcome of the lawsuit or on the PUC's later approval.

■ Public Service next cites *Colorado Energy Advocacy Office v. Public Service Co.,* 704 P.2d 298 (Colo.1985), as another exception to retroactive ratemaking. There, the tariff in place allowed the utility to recover the previous month's gas costs by rates that would be charged in the next month. In that case, however, the contract was in place specifying particular rates before the issue of retroactive ratemaking arose. Where a utility has a pre-existing tariff authorizing it to make rate adjustments for prior periods, such adjustments do not violate the retroactive ratemaking provision. *See City of Piqua, Ohio v. Federal Energy Regulatory Comm'n,* 610 F.2d 950 (D.C.Cir.1979); *Hall v. Federal Energy Regulatory Comm'n,* 691 F.2d 1184 (5th Cir.1982), *cert. denied sub nom. Arkla, Inc. v. Hall,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

Public Service also urges us to apply the reasoning from cases which permitted a utility to recover the costs of repairs after natural disasters through future rate increases. *See, e.g., Narragansett Elec. Co. v. Burke,* 415 A.2d 177 (R.I.1980); *Mississippi ex rel. Pittman v. Mississippi Public Serv. Comm'n,* 520 So.2d 1355 (Miss.1988). In

---

6. The decision of the PUC is also inconsistent with its earlier decision, *In the Matter of the Investigation of Moon Lake Electric Association, Inc., for Failure to Distribute Refund,* Case No. 6308, Decision No. C83–1268 (1983) (noting in a factually similar case that "[t]o allow a utility to retain refunds and apply them to past losses sets the stage for retroactive ratemaking").

these natural disaster cases, the utility was granted an exemption from the prohibition against retroactive ratemaking either because it faced financial insolvency or because essential services would not be able to be restored to the affected areas without the exemption. These circumstances are not present here, nor has Public Service made any showing of an economic need to retain the bonus.

None of these exceptions to the doctrine of retroactive ratemaking is applicable to this case. Accordingly, we find that the bonus approved by the Public Utilities Commission constituted retroactive ratemaking, in contravention of article II, section 11, of the Colorado Constitution.

### III.

The district court also found that the decision of the PUC to award the $3.27 million bonus to Public Service was unjust and unreasonable. Public Service argues on appeal that the decision of the Commission was reasonable and was justified because Public Service undertook "extraordinary efforts" to recover the refund from CIG.

### A.

■ The legislature has directed that all charges made by a public utility shall be just and reasonable. § 40–3–101(1), 17 C.R.S. (1993). The primary purpose of the Public Utilities Commission is to ensure that the rates charged are not excessive or unjustly discriminatory. *Cottrell v. City & County of Denver*, 636 P.2d 703 (Colo.1981). The PUC protects the right of consumers to pay a rate that accurately reflects the cost of service rendered,[7] and has a general responsibility to protect the public interest regarding utility rates. *City of Montrose v. Public Utils. Comm'n*, 629 P.2d 619 (Colo.1981).

■ Section 40–6–111, 17 C.R.S. (1993), gives the PUC the power to review rates that may be unreasonable or improper. § 40–6–111(1)(a), 17 C.R.S. (1993). This section applies to cases that challenge existing or proposed rates. *Peoples Natural Gas v. Public*

*Utils. Comm'n*, 197 Colo. 152, 590 P.2d 960 (1979). In deciding whether a rate is just and reasonable, the PUC is directed by the statute to consider

current, future, or past test periods or any reasonable combination thereof and any other factors which may affect the sufficiency or insufficiency of such rates … during the period the same may be in effect and may consider any factors which influence an adequate supply of energy and any factors which encourage energy conservation.

§ 40–6–111(2)(a), 17 C.R.S. (1993).

■ The district court's review of the Commission's decision is governed by section 40–6–115(3), 17 C.R.S. (1993), which states:

[T]he district court shall decide all relevant questions of law and interpret all relevant constitutional and statutory provisions. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

The exercise of the Commission's discretion and judgment should not be disturbed absent an abuse of discretion. *City of Montrose v. Public Utils. Comm'n*, 629 P.2d 619 (Colo. 1981). This court, along with other courts, has failed to fashion a cogent definition of abuse of discretion. One case that attempted a definition stated:

"We are sure that in many instances, in the years gone by, the rulings of presiding judges, in matters wherein they are given the right to exercise their discretion, were not interfered with because of the old unfortunate statement to the effect that it must be shown that there was an 'abuse of discretion.' Recently it has been shown time after time that the term 'abuse of discretion' does not mean any reflection upon the presiding judge, and it is a strict

---

7. *Public Serv. Co. v. Public Utils. Comm'n*, 644    P.2d 933 (Colo.1982).

legal term, to indicate that the appellate court is simply of the opinion that there was commission of an error of law in the circumstances."

*Medina v. District Court,* 177 Colo. 185, 186, 493 P.2d 367, 368 (1972) (quoting *Eager v. Derowitsch,* 68 Wyo. 251, 232 P.2d 713 (1951)). Our usual pattern in abuse of discretion cases is to review individual instances of potential error and decide in each case whether an abuse has occurred. It is somewhat like Justice Stewart and pornography: we know it when we see it.[8]

### B.

■ We agree with the district court that the PUC's decision to award a $3.27 million bonus to Public Service was unreasonable, unjust, and an abuse of discretion.

Public Service, through the rates it has collected from its customers, has recovered all of the costs it incurred in pursuing the CIG refund, including its attorney's fees. Even though Public Service has been "made whole," it still asserts it is entitled to a bonus because the efforts it undertook were "extraordinary." Public Service cites as examples of such efforts the fact that the litigation with CIG lasted for six years, that the case resulted in huge monetary benefits to consumers, and that some of the issues concerning the Gas Search Agreement were unique. No other examples of extraordinary efforts were offered by Public Service. We are unconvinced that the efforts undertaken by Public Service were so "extraordinary" that they would warrant a $3.27 million bonus payment.

The amount of the bonus payment rightly belongs to the customers of Public Service. The facts of this case are similar to those in *Citizens Utilities Co. v. City of La Junta,* 121 Colo. 261, 215 P.2d 332 (1950). There, we held that a fund, which contained monies representing overcharges of utility customers, was held in trust for the customers, and

the utility company had no title or ownership interest in it. The utility serves merely "as a conduit through which the refunded moneys should flow from the wholesalers to the consumers." *Public Serv. Co. v. City and County of Denver,* 153 Colo. 396, 400, 387 P.2d 33, 35 (1963). It would be unjust and unreasonable to withhold $3.27 million from those to whom it rightfully belongs.

Furthermore, the position of the PUC in this case directly contradicts its earlier decision, *In the Matter of the Investigation of Moon Lake Electric Association, Inc., for Failure to Distribute Refund,* Case No. 6308, Decision No. C83–1268 (1983). In that case, the utility received a refund from its wholesale gas supplier because the supplier had charged excessive prices. The utility considered keeping the refund and applying it to capital improvements. Ruling that the refund was not the property of the utility, but merely was held "in trust" for its customers, the PUC held that the utility had no right or interest in the money and could not retain it for capital improvements.

When CIG overcharged for the gas it supplied from 1982 to 1988, Public Service passed the overcharges through to its customers. The injured parties, then, are the consumers who were wrongfully overcharged, not Public Service. The purpose of the refund is to make whole those who suffered the loss as a result of the unlawfully high rates. We cannot countenance the distribution of funds to those who suffered no loss, at the expense of the consumers who did.

Finally, with reference to section 40–6–111(2)(a), which lists the factors to be considered by the PUC in determining whether a rate is just and reasonable,[9] we find that the PUC improperly decided that Public Service should receive the bonus as a reward for its litigation against CIG and to "motivate future results." These purposes are not

---

8. *See Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

9. The factors are "current, future, or past test periods or any reasonable combination thereof and any other factors which may affect the suffi-

ciency or insufficiency of such rates ... during the period the same may be in effect and ... any factors which influence an adequate supply of energy and any factors which encourage energy conservation." § 40–6–111(2)(a), 17 C.R.S. (1993).

among the factors listed in the statute, although, arguably, they may "affect the sufficiency or insufficiency" of the rates.[10]

Because the $3.27 million bonus awarded to Public Service rightfully belongs to the customers of Public Service, and was not part of the tariff in place at the time, and was improperly awarded by the Commission, we find that the decision of the PUC to award the bonus was unjust and unreasonable, and that the PUC abused its discretion.

## IV.

We affirm the decision of the district court and hold that the bonus awarded to Public Service by the Public Utilities Commission was an exercise in unconstitutional retroactive ratemaking, and that the Commission abused its discretion in awarding the bonus.

LOHR, J., dissents, and ROVIRA, C.J., and MULLARKEY, J., join in the dissent.

Justice LOHR, dissenting:

The majority affirms the district court's ruling that the Public Utilities Commission ("PUC" or "the commission") engaged in unlawful retroactive ratemaking when it authorized an incentive award to Public Service Company of Colorado ("Public Service") after Public Service successfully pursued litigation against a natural gas supplier to recover excessive charges for natural gas. The majority also affirms the district court's determination that the PUC's granting of the incentive award to Public Service was unjust, unreasonable, and an abuse of discretion. Because I disagree with the majority's analysis and conclusions as to both issues, I respectfully dissent.

I agree with the majority that ratemaking is a legislative function, subject to the constitutional prohibition against retroactivity.

See Colo. Const. art. II, § 11; *Colo. Energy Advocacy Office v. Public Service Co. of Colo.,* 704 P.2d 298, 305 (Colo.1985); *Peoples Natural Gas Division v. Public Utilities Comm.,* 197 Colo. 152, 155, 590 P.2d 960, 962 (1979). I conclude, however, that the effect of the PUC allocation to Public Service of a portion of the funds obtained by settlement of a complex contract dispute with Public Service's gas supplier, Colorado Interstate Gas Company, did not amount to unlawful retroactive ratemaking and that the allocation was fully within the commission's discretion.

## I.

In November 1990, Public Service filed an application with the PUC requesting PUC approval of a manner of disposition of payments that Public Service had received and would receive from Colorado Interstate Gas Company, its gas pipeline supplier. Public Service had recently reached a settlement with Colorado Interstate Gas, after more than six years of litigation before the Denver District Court and the Federal Energy Regulatory Commission. Colorado Interstate Gas had agreed to repay Public Service approximately $64 million, the amount it had overcharged Public Service over a period of several years. During that same period, Public Service had passed the charges on to its customers by charging higher rates. After settlement, Public Service intended to return to Public Service ratepayers their share of the settlement money received from Colorado Interstate Gas. In order to structure the refund, it asked the PUC to reduce future gas and electric rates or provide a one-time credit on customer bills. Public Service also asked that the PUC allow it to retain $5.75 million of the recovered charges

---

10. We recognize that the Public Utilities Commission has an incentive program in place with Public Service to encourage energy conservation by consumers. This "Demand Side Management" program, begun in the early 1990s, is incorporated into the tariff and rate structure, and rewards Public Service if it meets certain pre-established criteria related to the reduction of its customers' energy consumption. The program allows Public Service to recover some of the money it loses, as energy consumption de-

creases and it sells less service. The Demand Side Management program was approved by the Public Utilities Commission after extensive hearings (*see, e.g., Commission Decision and Order (1) Adopting Portions of a Settlement Agreement To Be the Basis for Cost Recovery for DSM Programs that Stem from the DSM Collaborative Process, and (2) Giving Directions Concerning Further Treatment of Certain Issues,* 139 Pub.Util.Rep. 4th 398 (1993)), but its legality has never been addressed by a court of law.

as a reward for pursuing the claim against Colorado Interstate Gas for the benefit of its ratepayers.

The PUC decided to grant Public Service a $3.2 million incentive, five percent of the original settlement. The commission stated:

> The incentive rewarded [sic] to Public Service is designed to motivate the company and its employees to pursue excellent results in the future, by demonstrating that they can benefit from superior performance. We believe that granting an incentive to the company is a reasonable step towards improved efficiency, and thus ultimately lower rates to customers in the future.

The PUC's decision was reversed by the Denver District Court. The court ruled that allowing Public Service to keep a portion of the refund constituted unlawful retroactive ratemaking and that granting the award was unjust, unreasonable, and an abuse of discretion. The district court entered judgment accordingly. The majority of this court now affirms that judgment. Because I disagree with both bases of the district court's decision, I dissent.

## II.

The constitutional provision regarding retroactive legislation, Colo. Const. art. II, § 11, "has been interpreted to prohibit legislation which 'takes away or impairs any vested right acquired under existing laws, or creates a new obligation, or imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'" *Peoples Natural Gas,* 197 Colo. at 155, 590

P.2d at 962 (quoting *Moore v. Live Stock Company,* 90 Colo. 548, 10 P.2d 950 (1932)). Here, neither has a vested right been impaired nor a new obligation been imposed. As stated by the district court, the prohibition against retroactive ratemaking is "based on the common sense notion that ratepayers have the right to know the charges for utility service before the services are rendered." *See also Public Util. Comm'n v. FERC,* 988 F.2d 154, 163 (D.C.Cir.1993) (stating "[p]redictability is an underlying purpose of ... the rule against retroactive ratemaking"). When Public Service's customers bought gas between 1979 and 1984, they had *no* expectation that they might receive a share of the settlement payments sometime in the future. Far from suffering from a retroactive rate increase, ratepayers unexpectedly benefitted by receiving all but five percent of the sixty-four million dollar settlement achieved through Public Service's extraordinary efforts· in bringing more than six years of complex contract litigation to a successful resolution.[1]

The Colorado Office of Consumer Counsel contends and the majority agrees that Public Service's ratepayers should have received one hundred percent of the recovered proceeds and that anything less amounts to retroactive ratemaking.[2] It argues that one commission decision, *In Re Moon Lake Electric Association, Inc.,* Case No. 6308, Decision No. C83–1268 (Colo. PUC 1983), as well as one of this court's decisions, *Citizens Utilities Co. v. City of LaJunta,* 121 Colo. 261, 215 P.2d 332 (1950), require such a finding.[3]

---

1. The actual amount received totaled $56.9 million, rather than $64 million, because by paying early, Colorado Interstate Gas avoided paying three years of interest.

2. The Office of Consumer Counsel argues that consumers are the "sole owners" of the refund and that therefore Public Service has no right to retain any portion thereof. In providing for distribution of the settlement payment, however, the commission approved tariff reductions in the amount of $13.2 million to both gas and electric consumers to implement a "long-planned correction" of the imbalance between electric rates and gas rates, despite the fact that only gas consumers were adversely affected by the overcharges. No one challenges the commission's decision to

distribute a portion of the refund to consumers of electricity or the Commission's discretion to award "the statutory maximum in effect on September 1, 1992," from the unclaimed balance to the Colorado Energy Assistance Foundation for the energy needs of low-income citizens. Nor does the majority suggest any impropriety in use of the refund in part to benefit persons other than consumers of gas. The majority's contention that ratepayers are always entitled to all of the refund is thus contradicted by the unchallenged means of allocation adopted by the commission.

3. "Because of the legislative character of ratemaking, the commission is not bound by its prior decisions or by any doctrine similar to *stare*

However, the evidence and findings in these cases are distinguishable. In neither *Moon Lake* nor *Citizens Utilities* was there ever any indication that the utility, which wanted to retain some of the amounts returned to it by its supplier, played any meaningful role in obtaining the refund. In addition, while the utility's claims in *Moon Lake* and *Citizens Utilities* were grounded in a desire to recoup unrelated past losses, Public Service in the present case is not seeking an increased rate in order to compensate for the losses of a previous period. *See Moon Lake*, Case No. 6308, Decision No. C83–1268 (Colo. PUC 1983) (noting that "[t]o allow a utility to retain refunds and apply them to past losses sets the stage for retroactive ratemaking"); *Citizens Utilities*, 121 Colo. 261, 215 P.2d 332 (court reversed commission's decision approving distribution of one-half of a fund to utility for rehabilitation of its local pipelines said to have rapidly deteriorated because of peculiar soil conditions). As the majority recognizes, Public Service had already been reimbursed for all of its attorney's fees and other costs associated with recovering the Colorado Interstate Gas fund. *See* Maj. op. at 870 n. 5. The commission's justification for awarding a portion of the fund to Public Service was forward looking not backward looking. The commission permitted retention of a portion of the recovered fund in order to provide utilities an incentive to exert extraordinary efforts to protect consumer interests in the future. *See City of Montrose v. Public Utilities Comm.*, 629 P.2d 619, 624 (Colo.1981) (the commission has a general responsibility to protect the public interest regarding utility rates and practices). I would hold that an award for this purpose is fully within the commission's broad discretionary power.

### III.

The Public Utilities Commission's power to regulate ratemaking is "equivalent to that of the legislature except as limited by statute." *Colo. Energy Advocacy Office*, 704 P.2d at

306. In fact, the PUC has " 'broadly based authority to do whatever it deems necessary or convenient to accomplish the legislative functions delegated to it.' " *City of Montrose*, 629 P.2d at 624 (Colo.1981) (quoting *Mountain States Telephone & Telegraph Co. v. Public Utilities Comm.*, 195 Colo. 130, 135, 576 P.2d 544, 547 (1978)). Those functions include:

> [the] duty to adopt all necessary rates, charges, and regulations to govern and regulate all rates, charges, and tariffs of every public utility of this state to correct abuses; to prevent unjust discriminations and extortions in the rates, charges, and tariffs of such public utilities of this state; to generally supervise and regulate every public utility in this state; and to do all things, whether specifically designated in articles 1 to 7 of this title or in addition thereto, which are necessary or convenient in the exercise of such power....

§ 40–3–102, 17 C.R.S. (1993). When establishing these rates, charges, or regulations, "the commission may consider current, future, or past test periods or any reasonable combination thereof and *any other factors which may affect the sufficiency or insufficiency of such rates....*" § 40–6–111(2)(a), 17 C.R.S. (1993) (emphasis added).

The PUC's determination that an award was appropriate was fully within its discretion. It allowed Public Service to retain $3.27 million of the recovered proceeds as an incentive "to encourage the company to pursue similar types of issues in the future." The commission reasoned:

> If no incentive were awarded, PSCo's management and employees would have less motivation to pursue settlements or other innovations leading to efficiencies or other benefits for its customers in the future. As the utility industry prepares to face new competition and other challenges, it is key to all, including consumers, that the company and its employees change the regulated monopoly mindset of "why both-

---

decis." *Colo. Ute Elec. Ass'n v. Public Utilities Comm.*, 198 Colo. 534, 540–41, 602 P.2d 861, 865 (1979). "[W]hile consistency in administrative rulings is considered essential, and while agency rulings are entitled to great weight in

subsequent proceedings, the appearance of arbitrariness is dispelled when new findings are made ... on the basis of new evidence and a new record." *Id.* at 541, 602 P.2d at 865 (citation omitted).

er making an extra effort to improve revenues or reduce costs, the Commission will just take it away in the next rate case anyway." The incentive rewarded [sic] to Public Service is designed to motivate the company and its employees to pursue excellent results in the future, by demonstrating that they can benefit from superior performance. We believe that granting an incentive to the company is a reasonable step towards improved efficiency, and thus ultimately lower rates to customers in the future.

While the district court has the power, by statute, to review decisions of the PUC, "the scope of permissible judicial review is relatively narrow." *City of Montrose,* 629 P.2d at 622. The district court's evaluation extends only to determining "whether the commission has regularly pursued its authority," and "whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence," § 40–6–115(3), 17 C.R.S. (1993). The commission's discretion and judgment on rate matters is not to be disturbed on appeal absent a clear abuse of discretion. *See City of Montrose* 629 P.2d at 624.

Considering that the commission found it to be in the public's interest to grant Public Service an incentive for future performance, and that no statute prohibits the granting of such an incentive where the commission finds it to be in the public's interest, I cannot agree with the majority that the commission's ruling was unjust, unreasonable, or an abuse of discretion.

I respectfully dissent and would reverse the judgment of the district court and remand the case to that court with directions to affirm the decision of the PUC authorizing the incentive award to Public Service.

ROVIRA, C.J., and MULLARKEY, J., join in this dissent.